LUIS AYALA CÓRDOVA, ANTONIA CRUZ DE AYALA y la SOCIEDAD DE GANANCIALES compuesta por éstos, demandantes y recurridos, *v.* SAN JUAN RACING CORPORATION y OTROS, demandados y recurrentes.

*Número:* R-79-11      *Resuelto:* 14 de mayo de 1982

*Gonzalo J. Barreras Varona,* abogado de los recurrentes; *José E. de la Cruz Skerret, Marcelino Meléndez La Fontaine* y *Luis Carbone,* abogados de los recurridos.

EL JUEZ ASOCIADO SEÑOR IRIZARRY YUNQUÉ emitió la opinión del Tribunal.

Revisamos en el presente caso una sentencia que concedió indemnización al Sr. Luis Ayala Córdova y a su esposa por daños y perjuicios causados como consecuencia de la detención ilegal de que él fue objeto mientras asistía a un evento hípico en el Hipódromo El Comandante. Los planteamientos de los demandados recurrentes requieren que examinemos la naturaleza de la acción por detención ilegal en relación con las acciones por difamación libelosa y por persecución maliciosa, y que consideremos algunos aspectos procesales sobre admisibilidad y alcance de prueba documental y testifical con respecto a la condición de salud de una persona. Resolvemos finalmente que procede sostener la decisión del tribunal recurrido en cuanto responsabilizó a los demandados recurrentes, aunque deberá modificarse la cuantía de la indemnización concedida al señor Ayala Córdova al evaluarse el efecto del incidente sobre su persona.

## I

Los hechos se desarrollaron como a continuación se expone. Para el 10 de noviembre de 1974 la codemandada San Juan Racing Association Corp. era dueña del Hipódromo El Comandante y lo administraba. Además de sus propios empleados de seguridad, dicha corporación mantenía en vigor un contrato de servicios de vigilancia especial con la Policía de Puerto Rico, mediante paga, en virtud del cual se destacaban miembros de la Policía en el Hipódromo, que compartían con dichos empleados de seguridad la función de mantener el orden en días de carreras.

En la expresada fecha se celebraban carreras de caballos. Concluida la primera carrera, un agente de seguridad del Hipódromo sospechó que el Sr. Luis Ayala Córdova hacía apuestas clandestinas, al observar que pasó

dinero a otras personas y éstas no se movieron a hacer jugadas en las bancas. Sin más observación de actuaciones similares adicionales por parte del señor Ayala Córdova ni comprobación de que en efecto estuviera violando la ley, se comunicó con el policía Héctor Orozco, quien prestaba servicios de vigilancia especial como miembro de la Policía de Puerto Rico, y le señaló que el señor Ayala Córdova "estaba jugando clandestino". Éste se hizo acompañar de otro compañero policía y se dirigió hacia donde estaba Ayala Córdova, quien se hallaba acompañado de una vecina y amiga de la familia, de nombre María González. El incidente que a continuación ocurrió fue recogido por el tribunal sentenciador en las siguientes determinaciones de hecho:

2. Después de la primera carrera del programa para la tarde hípica, se acercó al demandante Luis Ayala, el policía estatal Héctor Orozco. Éste le instruyó que tenía que acompañarle. El demandante le requirió una explicación al arresto, pero no se le ofreció. Al policía hacer contacto físico con el demandante, éste rechazó acompañarlo. El policía Orozco, tomándolo por los brazos le obligó a salir al pasillo iniciando su marcha hasta la Oficina de la Guardia de Seguridad del Hipódromo. El arresto llamó la atención, arremolinándose los expectadores [sic] alrededor del demandante. Entonces se unieron miembros de la guardia de seguridad del hipódromo asistiendo al policía Orozco en la tarea del arresto, ya que el demandante se resistía a la vez que pronunciaba lenguaje obsceno.

3. La señorita María González también fue intervenida y en presencia de la guardia de seguridad del hipódromo, se le vació el contenido de su cartera, registrándose entonces el mismo luego de lo cual se le informó que podía marcharse y se fue a su casa. Ella entregó la cartera cuando se le solicitó sin ofrecer resistencia.

4. El demandante Ayala Córdova, quien estaba siendo llevado aplicándole un agarre de mano a su espalda a nivel de la cintura, sufrió caídas en el trayecto y haciendo uso de la fuerza se le obligó a subir las escaleras y al llegar a la

puerta de entrada de la oficina de la guardia de seguridad se le agredió por la espalda cayendo al piso en la misma oficina. Allí se le registró y, según se alega, se le sustrajo la suma de $310.00 que llevaba consigo. No se preparó ningún informe sobre este arresto ni tampoco se hizo anotación en el libro de novedades que se mantenía en la oficina de seguridad del Hipódromo El Comandante. Lo anterior ocurrió en la oficina, ante la presencia del demandado José Nazario, Jefe de Seguridad y exteniente [*sic*] de la Policía de Puerto Rico, y del demandado Zoilo Reyes, quien también había sido policía estatal, y segundo en el mando del grupo de guardias del hipódromo. Este último inclusive fue la persona que una vez en la oficina, se encargaba de "tranquilizar" al demandante forzándolo a que se estuviera quieto en una silla donde fue sentado.

5. El origen del arresto fue que alegadamente un empleado de seguridad del hipódromo observó una escena aparentemente delictiva conducida por el demandante Luis Ayala Córdova al aceptar apuestas clandestinas. Dicho empleado promovió el arresto a través de uno de los policías estatales. El registro practicado en la persona del demandante y de su acompañante demostró que éstos no poseían nada, que le incriminaran [*sic*] en delito alguno. No se radicaron denuncias contra ninguna de las personas envueltas en los incidentes. El demandante ante la mirada de varios expectadores [*sic*], abandonó la caseta de seguridad, temblándole su cuerpo, descompuesto emocionalmente, llorando y con su camisa abierta y regresó a su casa.

6. El demandante Ayala es una persona con un largo historial médico de desajustes mentales y, además, tiene otros padecimientos físicos, por los cuales está pensionado. Los incidentes, no cabe duda, tuvieron un dramatismo e impacto superior en la persona del demandante por su condición física y mental. El demandante trató de mostrar una tarjeta expedida por la Administración de Veteranos que hacía constar la incapacidad del mismo, pero declaró que su intento fue frustrado al ser desatendido su reclamo.

7. Después de acontecidos los hechos de referencia, el demandante fue recluido de emergencia con la asistencia de sus dos hijos, el 18 de noviembre de 1974, en la división de psiquiatría del Hospital de Veteranos, donde permaneció 21

días, hasta el 9 de abril de 1974, [*sic*] siendo referido para seguimiento a la Clínica de Higiene Mental.

Esas determinaciones de hecho tienen respaldo en la prueba desfilada, cuya exposición narrativa ordenamos y hemos examinado. Se demandó a San Juan Racing Association Corp., a los empleados de seguridad y a su aseguradora Reserve Insurance Company. Contra la sentencia que les ordena indemnizar al señor Ayala Córdova en la suma de $21,500 y a su esposa en la cantidad de $2,500 por los daños sufridos, más $1,000 para honorarios de abogado(¹) los demandados han recurrido. Sus planteamientos pueden resumirse en tres imputaciones de error, a saber: en las determinaciones sobre prueba médica, al responsabilizar a los demandados, y en la fijación de la indemnización. Los consideraremos en orden a su importancia.

## II

Los recurrentes plantean que no se les debió responsabilizar por no haberse establecido mediante la prueba que los empleados de San Juan Racing instigaran a los agentes de la Policía para que actuaran contra el demandante en la forma en que lo hicieron. Citan en su apoyo los casos de *Cortés Portalatín* v. *Hau Colón*, 103 D.P.R. 734 (1975), y *Raldiris* v. *Levitt & Sons of P.R., Inc.*, 103 D.P.R. 778 (1975). Dichos casos son distinguibles del presente. En *Cortés Portalatín* la causa de acción invocada se basó en un alegado libelo contenido en una carta en que se informaba sobre determinadas actuaciones del demandante en la casa del demandado y la coincidencia de la desaparición de un revólver que el demandado tenía en su casa. En *Raldiris* se trataba de una alegada persecución maliciosa de parte de un empleado de la corporación demandada al informar

---

(¹) La Srta. María González no fue parte en este pleito en instancia ni está su caso ante nuestra consideración.

hechos a la Policía que culminaron con el encausamiento del demandante por el delito de hurto, del cual fue absuelto. En ambos casos revocamos las sentencias que condenaron a los demandados a indemnizar a los demandantes por daños.

Resolvimos en *Cortés Portalatín* que, aparte de no haberse probado que la queja contenida en la carta se debiera a motivos impropios o fuese irrazonable o que el demandado le hubiese impartido publicidad, éste estaba protegido por la "doctrina del privilegio restringido". Señalamos, pág. 739: "Un ciudadano que sospeche razonablemente que se ha cometido o que se piensa cometer un crimen tiene el privilegio, para su protección y la de la sociedad, de comunicárselo a las autoridades correspondientes o a quien él crea de buena fe que pueda tomar acción correctiva. La comunicación puede ser falsa, pero el privilegio persiste."

Señalamos en *Raldiris*, pág. 781, que para que sea accionable civilmente una causa originada en persecución maliciosa no es suficiente el mero hecho de que el demandado informe a las autoridades la comisión de un delito, "sino que debe demostrarse que el demandado instigó activa y maliciosamente la iniciación del proceso y que no fueron las autoridades quienes a base de su propia evaluación de los hechos decidieron procesar al demandante". Al igual que en *Cortés Portalatín*, subrayamos, pág. 782, la necesidad de proteger contra esta clase de reclamaciones al ciudadano que de buena fe y a base de una creencia razonable informa a la Policía sobre la comisión de un crimen.

La causa de acción ejercitada en el presente caso no se basa ni en libelo ni en persecución maliciosa. Se trata aquí de un caso de detención ilegal. Aunque la acción por libelo fue reconocida expresa y específicamente por la Ley de 19 de febrero de 1902 (32 L.P.R.A. secs. 3141 a 3149), en ausencia de dicho estatuto tendría base, como la persecu-

ción maliciosa y la detención ilegal, en la disposición general del Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141, que dice:

> Sec. 5141. *Obligación cuando se causa daño por culpa o negligencia*
>
> El que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado. La imprudencia concurrente del perjudicado no exime de responsabilidad, pero conlleva la reducción de la indemnización.

Más aún, como señaláramos en *Cortés Portalatín*, supra, estas causas de acción serían autoejercitables, *ex proprio vigore*, aun en ausencia de dicha disposición del Código Civil ni de ley alguna, en vista de las disposiciones constitucionales que consagran el principio de inviolabilidad de la dignidad del ser humano,[2] el derecho a la libertad,[3] el derecho de toda persona a la "protección de ley contra ataques abusivos a su honra, a su reputación y a su vida privada o familiar".[4] *Colón Vda. de Rivera*. v. *Romero Barceló*, 112 D.P.R. 573 (1982); *Figueroa Ferrer* v. *E.L.A.*, 107 D.P.R. 250, 259-260 (1978); *E.L.A.* v. *Hermandad de Empleados*, 104 D.P.R. 436, 440 (1975); *Alberio Quiñones* v. *E.L.A.*, 90 D.P.R. 812, 816 (1964); *González* v. *Ramírez Cuerda*, 88 D.P.R. 125, 133 (1963).

La tipificación de estas causas de acción, particularmente persecución maliciosa y detención ilegal, es de naturaleza jurisprudencial, adoptada en esta jurisdicción del Derecho angloamericano. Allá se les conoce como *malicious prosecution* y *false imprisonment*, y a cada una se le señalan características definitorias particulares. Así, el primer caso que informa nuestra jurisprudencia en que se reclamó indemnización por persecución maliciosa —*Parés*

---

[2] Carta de Derechos, Art. II, Sec. 1.

[3] Carta de Derechos, Art. II, Sec. 7.

[4] Carta de Derechos, Art. II, Sec. 8.

v. *Ruiz*, 19 D.P.R. 342 (1913)— adoptando criterios de juris-
prudencia norteamericana, estableció (pág. 346):

En las acciones por persecución maliciosa, cuatro son los
elementos esenciales que deben alegarse y probarse, a saber:

1. Que el demandante ha sido denunciado por el deman-
dado.

2. Que la causa terminó de modo favorable para el
demandante.

3. Que fué seguida maliciosamente y sin que existiera
causa probable.

4. Que el demandante sufrió daños y perjuicios como
consecuencia de ello. Field on Damages, artículo 686, pág.
544; 26 Cyc., 8; *Breneman* v. *West*, 21 Tex. Civ. App., 21, 50
S.W. Rep., 471; *Collins* v. *Campbell*, 18 R.I. 738, 31 Atl. Rep.
832.

Estos requisitos de la acción por persecución maliciosa
han sido reiterados en *Rivera* v. *Casiano*, 68 D.P.R. 190
(1948); *Jiménez* v. *Sánchez*, 76 D.P.R. 370 (1954); *Fonseca*
v. *Oyola*, 77 D.P.R. 525 (1954); *Escoda* v. *Hull Dobbs Co. of
P.R.*, 100 D.P.R. 305 (1971); *Raldiris* v. *Levitt & Sons of
P.R., Inc.*, supra, pág. 781.

La acción por detención ilegal no ha sido específica-
mente depurada en nuestra jurisprudencia, quizás porque
cuando se ha reclamado ha estado sumergida en alega-
ciones por persecución maliciosa. Y es que la persecución
maliciosa, si bien se inicia con la persona de un instigador
que maliciosamente mueve el aparato represivo del Estado
para lograr el encausamiento criminal de una persona,
casi siempre produce el arresto o detención de la víctima.
¿Quiere ello decir que no puede haber detención ilegal si
falta un instigador? La respuesta es, obviamente, no.

En *Casanova* v. *González Padín Co.*, 47 D.P.R. 488, 498
(1934), también haciendo uso de citas de jurisprudencia
norteamericana, se definió la detención o "prisión" ilegal
—la sinonimia se utiliza indistintamente— así:

Entiéndese por prisión ilegal el acto de restringir ilegal-
mente a una persona contra su voluntad o libertad de acción
personal. La médula del delito de prisión ilegal la constituye
la detención ilegal. 25 C.J. 443.

De aquí se deduce que puede existir una causa de
acción por detención ilegal sin que exista o culmine en la
persecución maliciosa. Una persona, sea o no funcionario
del orden público, puede por sí, o por mediación de otro,
detener ilegalmente o causar que se detenga ilegalmente a
otra persona. En ambos casos dicha persona respondería
en daños y perjuicios, si dicha actuación es culposa o
negligente.

Es así en el Derecho angloamericano. Véanse Prosser,
*Law of Torts*, 4ta ed., 1971, sec. 11; *Restatement* (Second),
Torts 2d, 1965, secs. 35 y 44. Y es así bajo la teoría general
de las obligaciones que emanan de culpa y negligencia
reconocidas en el Derecho civil. Castán, *Derecho civil
español, común y foral*, 1977, T. 4, págs. 894–895, señala:

El supuesto de la responsabilidad extracontractual lleva
consigo, como advierten los anotadores de Enneccerus, la
lesión de un derecho subjetivo o de cualquiera de los bienes
de la persona cuyo menoscabo sea susceptible de producir un
daño. "Al sancionar la obligación de reparar el daño causado
a otro por acción u omisión culposa o negligente, el art. 1.902
no ha especificado (a diferencia de lo que hace el Código
alemán) una serie de derechos cuya lesión constituya el
fundamento de la pretensión de indemnización. El artículo
citado no exige literalmente más que un daño, sin otra
especificación; pero es evidente que quedan comprendidas en
su previsión las lesiones contra la vida, el cuerpo, la salud, la
*libertad*, la propiedad y cualquier otro bien de la persona,
tenga o no entidad de derecho subjetivo." No se excluye
tampoco el *honor*, como lo demuestran, entre otras, las
sentencias de 6 de diciembre de 1912, 14 de diciembre de
1917, 12 de marzo de 1928, 31 de marzo de 1931, 25 de junio
de 1945, 28 de febrero de 1959 y 7 de febrero de 1972. "Todo
acto positivo que cause daño, salvo que esté justificado o
permitido por el Derecho, está prohibido o bien concreta-
mente por disposición especial o bien generalmente por el

814

principio *alterum non laedere* del art. 1902." (Énfasis suplido.)

Véase, al mismo efecto Colin Capitant, *Curso elemental de Derecho civil*, Madrid, 1960, T. II, pág. 774, citado por Castán.

Sobre la coincidencia ocasional de los dos sistemas tradicionales de Derecho —el angloamericano y el civil— en el ámbito de la responsabilidad extracontractual, lo que explica el uso para fines de Derecho comparado de doctrinas del Derecho común en estos casos, dice Puig Brutau, *Fundamentos de Derecho civil*, 1956, T. II, Vol. II, pág. 660:

> Sin embargo, a pesar de esta divergencia entre los derechos del grupo que podríamos llamar continental y el angloamericano, la materia regulada es de las que ofrece caracteres más uniformes en todos los países. Cabe recordar las palabras de Ferdinand F. Stone: "desde el momento que los hombres se portan de manera semejante en Italia que en Wisconsin y que los progresos de la técnica, en general, imprimen rasgos comunes en la vida social de las más distintas partes del mundo, es natural que los problemas puedan resolverse con técnicas jurídicas, no imitadas o copiadas, pero sí inspiradas en la experiencia ajena." Aun con grave riesgo de afirmar una vulgaridad, nos atrevemos a señalar que si el acto, por ejemplo, de contraer matrimonio está ligado en cada país a valores sociales diversamente arraigados, el acto de cruzar una calle y sufrir el atropello causado por un vehículo de propulsión mecánica tiene en todas partes la misma significación.

Al mismo efecto, véase *Futurama Import Corp.* v. *Trans Caribbean*, 104 D.P.R. 609, 610 (1976).

Desde el punto de vista de la responsabilidad civil que pueda exigirse a quien personalmente efectúe la detención ilegal de una persona, conviene resaltar que nuestro ordenamiento procesal penal es menos restrictivo cuando se trata de un agente del orden público que cuando se trata de una persona particular. Véanse las Reglas 11 y 12

de Procedimiento Criminal.(5) Es razonable que así sea, pues el agente del orden público tiene la obligación específica de "prevenir, descubrir y perseguir el delito y, dentro de la esfera de sus atribuciones, compeler obediencia a las leyes y ordenanzas municipales, y reglamentos que conforme a éstas se promulguen". Ley de la Policía de Puerto Rico, 25 L.P.R.A. sec. 1003. Si bien esa es, además, obligación de la ciudadanía en general, la persona particular ha de ser más prudente al intervenir con la libertad de un individuo, sea si lo hace directamente o si lo hace por mediación de un agente del orden público, pues la persona particular de ordinario no posee el entrenamiento especializado que para el desempeño de sus funciones recibe el agente del orden público.

■ La determinación sobre la procedencia de una acción civil por daños contra la persona particular que efectúa o causa la detención de un ciudadano que no ha cometido delito, bajo circunstancias que no constituyen una persecución maliciosa, ha de depender de criterios de

---

(5) Disponen de la siguiente manera:

Regla 11. *Arresto por un Funcionario del Orden Público*

"Un funcionario del orden público podrá hacer un arresto sin la orden correspondiente:

"(a) Cuando tuviere motivos fundados para creer que la persona que va a ser arrestada ha cometido un delito en su presencia. En este caso deberá hacerse el arresto inmediatamente o dentro de un término razonable después de la comisión del delito. De lo contrario el funcionario deberá solicitar que se expida una orden de arresto.

"(b) Cuando la persona arrestada hubiese cometido un delito grave (*felony*), aunque no en su presencia.

"(c) Cuando tuviere motivos fundados para creer que la persona que va a ser arrestada ha cometido un delito grave (*felony*), independientemente de que dicho delito se hubiere cometido o no en realidad."

Regla 12. *Arresto por Persona Particular*

"Una persona particular podrá arrestar a otra:

"(a) Por un delito cometido o que se hubiere intentado cometer en su presencia. En este caso deberá hacerse el arresto inmediatamente.

"(b) Cuando en realidad se hubiere cometido un delito grave (*felony*) y dicha persona tuviere motivos fundados para creer que la persona arrestada lo cometió."

razonabilidad. En la búsqueda de un adecuado balance entre la obligación que toda persona tiene de cooperar en la lucha contra el crimen y el derecho que toda persona tiene a no ser privado ilegalmente de su libertad, el criterio de razonabilidad debe aplicarse a base de las circunstancias de cada caso. Aparte de los requisitos de legalidad que hallamos en las Reglas 11 y 12 de Procedimiento Criminal, antes transcritas (escolio 5), debe recurrirse a la figura del hombre prudente o razonable, el *reasonable man* de la jurisprudencia angloamericana, equivalente al "buen padre de familia" a que se refiere el Derecho civil. Sobre el particular, son atinadas las siguientes expresiones de Puig Brutau, *op. cit.*, pág. 681:

> . . . Con más motivo, en materia de culpa aquiliana deberá atenderse de manera general al prototipo de conducta que corresponde al *diligens paterfamilias* (*cf.* el segundo párrafo del art. 1.104), que sin duda favorece la adopción de un criterio objetivo para fundar la culpabilidad, de la misma manera que según hace notar Lawson, el abogado inglés recurre al *standard* representado por la conducta del *reasonable man*, del hombre razonable. Como señala este mismo autor, "en todo caso, la distinción entre un standard subjetivo y el que sea objetivo no puede resultar tan claro en la práctica como tantas veces se hace aparecer en teoría, pues aunque la responsabilidad se haga depender de la intención (*state of mind*) del demandado, la única manera de comprobarla normalmente consistirá en comparar su conducta con la de un hombre razonable en las mismas circunstancias". (Escolios omitidos.)

La razonabilidad de las actuaciones de la persona que es demandada civilmente en daños por alegada detención ilegal del demandante y su responsabilidad por ello, deben medirse tomando en consideración los siguientes factores: la persona del demandado, su edad, preparación intelectual, condiciones morales y sus experiencias previas; la persona del detenido, incluso su edad, apariencia y su comportamiento; conocimiento que en la fecha de los hechos

tuviera el demandado de la persona del detenido y aquellas que con él se relacionaban; la conducta sospechosa, incluso la gravedad del delito que ella pudiera implicar, el lugar, la ocasión, y la frecuencia de dicha conducta. El listado de estos factores no pretende ser exhaustivo. Cada caso tiene sus peculiaridades que deberán tomarse en cuenta al determinar si se incurrió o no en una detención ilegal.

Atendidos los particulares expuestos, es insostenible la posición de los aquí recurrentes de que no incurrieron en responsabilidad. Los empleados del Hipódromo, si observaron conducta sospechosa de parte del señor Ayala Córdova, por su especial función de agentes de seguridad y experiencia en su trabajo, pudieron y debieron esperar a confirmar si en efecto dicha conducta era delictiva. Por el contrario, observada la conducta sospechosa al terminar la primera carrera, no esperaron a ver si se repetía dicha conducta en otras carreras. No fueron ante los agentes del orden público unos meros informadores de una sospecha, sino que les expresaron que el demandante estaba "jugando clandestino". Y no se concretaron a dar dicha información, sino que se unieron y asistieron al policía Orozco en la tarea del arresto y facilitaron la oficina de seguridad del Hipódromo en que lo mantuvieron detenido ellos y la Policía. Allí lo registraron, lo amenazaron y agredieron, y finalmente lo expulsaron de los terrenos del Hipódromo. Dijimos en *Dobbins* v. *Hato Rey Psychiatric Hospital*, 87 D.P.R. 30, 36 (1962):

La responsabilidad por los daños causados con motivo de un encarcelamiento ilegal recae no sólo sobre las personas que perpetran el confinamiento, sino también sobre quienes lo ordenan o instigan, aun cuando no participen activamente en el acto físico de la detención. *Jillson* v. *Caprio*, 181 F.2d 523 (C.A. D.C. 1950), comentado en 49 Mich. L. Rev. 917 (1951), 25 St. John's L. Rev. 100 (1950) y 35 Cornell L.Q. 904 (1950); *Mayo Hotel Company* v. *Cooper*, 298 P.2d 443 (Okl. 1956); *Matovina* v. *Hult*, 123 N.E.2d 893, 898 (Ind. 1955).

■ Cabe señalar, además, que los agentes del orden público que intervinieron con el demandante actuaron en el desempeño de una relación especial para beneficio de San Juan Racing, en virtud del contrato existente entre San Juan Racing y la Policía de Puerto Rico. Los policías eran, como los agentes de seguridad, un brazo extendido de San Juan Racing.

En resumen, no se trata aquí de un caso de difamación. La prueba no estableció, ni concluyó el tribunal de instancia como cuestión de hecho, que al señor Ayala Córdova se le imputara públicamente la comisión de un delito. Tampoco se trata de un caso de persecución maliciosa, pues no se instó acción judicial alguna contra el demandante. De hecho, luego de detenérsele y registrársele se comprobó que no había base alguna para encausarlo. Se trata de un caso de detención ilegal en que, además de la instigación activa y persuasiva por parte de un empleado del Hipódromo, hubo la participación y cooperación afirmativa y voluntaria entre policías al servicio del Hipódromo y empleados de la empresa en la detención ilegal y prolongada del demandante en una dependencia del Hipódromo. Ante dichas actuaciones los demandados no pueden evadir su responsabilidad civil.

### III

En cuanto a la prueba sobre la manera como fue afectado el demandante Ayala Córdova, alegan los recurrentes que el tribunal de instancia erró al considerar en su totalidad el récord médico sobre su hospitalización, no obstante haberse estipulado que se admitiera solamente parte de dicho récord. Alegan además que las determinaciones del tribunal sobre el efecto del incidente sobre el demandante son erróneas por no estar basadas en testimonio pericial.

■ Un examen de los autos demuestra que el récord se ofreció como prueba del demandante en el "Informe sobre

Conferencia Preliminar entre Abogados", suscrito por los abogados de ambas partes. La parte número seis de dicho informe dice:

6. Prueba Documental:

A) Parte Demandante:

. . . . . . . .

2. Record médico del demandante, Luis Ayala Córdova, en el Hospital de Veteranos.

Sobre estos documentos no hay objeción.

B) Parte Demandada:

Ninguna.

Es evidente que el récord se ofreció, sin objeción, en su totalidad. Así surge también de una estipulación hecha en corte abierta, cuya transcripción se ha unido a los autos ante nos. En lo aquí pertinente, dice (Transcripción de Autos, pág. 29):

Lic. Carbone:

La parte demandada y la parte demandante han llegado a unos acuerdos de ofrecer varias estipulaciones para que el Tribunal se sirva impartir la aprobación de las mismas, si es que así estima el Tribunal, y son las siguientes:

La número uno, V.H., es que se ofrece el récord médico completo del demandante que comienzà con su admisión al Hospital de la Administración de Veteranos el día 19 de junio de 1951 y finaliza con la anotación del 12 de julio de 1976. Esa es la primera estipulación que ofrecemos a la consideración del Tribunal, V.H.

Más adelante se dice que se estipula la evaluación (*assessment*) que está en dicho récord y el tratamiento (*plan*) recibido por el demandante. La frivolidad de ese alegado error es patente.

En cuanto a la ausencia de testimonio pericial, también es inmeritorio el planteamiento. El récord médico, cuya admisión se estipuló, es por sí solo prueba de la

condición del demandante. La relación causal entre el incidente y la reclusión del demandante en el hospital ocho días después no era menester probarla mediante testimonio pericial. La prueba circunstancial era suficiente para que el tribunal pudiera inferir esa relación. El testimonio de la esposa del demandante sobre el particular permitía así hacerlo, y dicho testimonio no era inadmisible. Declaró ella que durante esos ocho días él se mostraba sumamente nervioso y belicoso y fue eso lo que la llevó a recluirlo. Esas percepciones suyas eran admisibles bajo el estado de Derecho probatorio vigente en la fecha del juicio, que las Reglas de Evidencia de 1979 han recogido en la núm. 51, así:

> Si un testigo no estuviere declarando como perito, su declaración en forma de opiniones o inferencias se limitará a aquellas opiniones o inferencias que estén racionalmente basadas en la percepción del testigo y que sean de ayuda para el mejor entendimiento de su declaración o para la determinación de un hecho en controversia.

Esa Regla tiene su antecedente en el Art. 20 de la anterior Ley de Evidencia, Art. 381 del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 1662, que disponía:

> Un testigo sólo puede declarar sobre hechos que le consten personal y directamente; es decir, que se deriven de sus propias percepciones, excepto en los pocos casos expresos en que sus opiniones o inferencias, o las declaraciones de otras personas, sean admisibles.

Nuestra jurisprudencia interpretó esa disposición para permitir que una persona, no perito, pudiera declarar sobre el estado de ánimo que observó en otra persona, *Pueblo* v. *Arcelay Galán*, 102 D.P.R. 409 (1974); *Pueblo* v. *Martell Cajigas*, 88 D.P.R. 636 (1963); sobre el aspecto de enfermo de una persona, *Pueblo* v. *Gerardino*, 37 D.P.R. 185 (1927); sobre sufrimientos de un enfermo, *Yordán* v. *Ríos*, 68 D.P.R. 259, 263 (1948). En ausencia de prueba de que el demandante se tornara belicoso y nervioso por razón

de otra causa, estaba justificado el tribunal en inferir que tal condición fue consecuencia del incidente en el Hipódromo y causa de su hospitalización ocho días después.

## IV

■ En el ejercicio de la causa de acción por detención ilegal el demandante tiene derecho a indemnización por el valor del tiempo perdido, por los inconvenientes y molestias físicas sufridas y por cualquier efecto adverso sobre su salud. Como el daño principal es de naturaleza mental, tiene derecho a recobrar por sus sufrimientos mentales, humillaciones, y daños morales análogos. Véase Prosser, *Law of Torts*, 4ta ed., 1971, Sec. 11.

En la demanda instada en instancia, con excepción de una alegación sobre la sustracción de $310 al señor Ayala Córdova, no se alegan daños especiales. Las determinaciones de hechos del tribunal sentenciador se limitan, igualmente, a daños morales, señalándose en la núm. 6 que los incidentes ocurridos en el Hipódromo "tuvieron un dramatismo e impacto superior en la persona del demandante por su condición física y mental". El récord médico, recogido en la número ocho de las determinaciones de hecho, describe al señor Ayala Córdova como un hombre de cincuenta años de edad, casado, desempleado, con preparación escolar de octavo grado, y con una incapacidad reconocida de cien por ciento. Recibe pensión de la Administración de Veteranos, según conclusión del tribunal de instancia.

En cuanto a su condición física, el examen que le fuera practicado no reveló condición extraordinaria digna de mención. El récord revela, en cuanto a condición mental, un caso de esquizofrenia crónica de tipo no diferenciado. El primer día de admisión al hospital —ocho días después del incidente— el señor Ayala Córdova no pudo ser entrevistado debido a que estaba confundido y tenía ideas agresivas. Tras veintiún días de tratamiento a base de

psicoterapia individual, terapia ocupacional y recreativa, y farmacoterapia, fue dado de alta para seguimiento en una Clínica de Higiene Mental. Estaba en contacto con la realidad, sin que tuviera ideas suicidas u homicidas. Su incapacidad se considera severa.

■ No surge de la prueba que el incidente objeto de este recurso agravara de manera permanente la condición que ya aquejaba al señor Ayala Córdova. Por otro lado, es de esperar que una persona de su condición mental fuese más susceptible que una persona normal para una más grave y notable alteración de su sistema ante la provocación y humillación a que fue sometido. Es lógica la inferencia del tribunal de instancia al hallar relación causal entre el incidente del 10 de noviembre de 1974 y las reacciones que finalmente motivaron su hospitalización durante tres semanas. Véase *Muñoz* v. *Escudero*, 42 D.P.R. 540, 549 (1931). Considerado todo ello, nos parece que una indemnización en la suma de $10,000 está más proporcionada a los daños morales real y efectivamente causados.

Por las consideraciones que hemos expuesto, *se modificará la sentencia recurrida para reducir a $10,000 la indemnización concedida al demandante Luis Ayala Córdova y, así modificada, será confirmada.*