Michael McCARTHY, et al. Arthur
Waskow, et al., Appellants,

v.

Richard G. KLEINDIENST, et al.

No. 83–1789.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 13, 1984.
Decided Aug. 17, 1984.

Gregory, Jr. and Sheila J. Carpenter, Washington, D.C., were on the brief, for appellants. Michael S. Smith, Washington, D.C., also entered an appearance for appellants.

Richard B. Nettler, Asst. Corp. Counsel, with whom Charles L. Reischel, Deputy Corp. Counsel and Michael E. Zielinski, Asst. Corp. Counsel, Washington, D.C., were on the brief, for appellee, District of Columbia.

David H. White, Atty., Dept. of Justice, Washington, D.C., with whom J. Paul McGrath, Asst. Atty. Gen., Joseph diGenova, U.S. Atty. and Barbara L. Herwig, Atty., Dept. of Justice, Washington, D.C., were on the brief, for appellees, Kleindienst, et al.

Before TAMM, MIKVA and STARR, Circuit Judges.

STARR, Circuit Judge:

This case arises out of the 1971 "May Day" demonstrations throughout Washington, D.C. in protest against the Vietnam War. The principal, and ultimately dispositive, question presented by this appeal is whether the District Court abused its discretion when it refused to certify this case as a class action. For the reasons that follow, we affirm.

I

This litigation is of some considerable vintage, yet at this late date the questions before us are entirely of a threshold procedural nature. The complaint was filed by thirty-nine named plaintiffs on May 1, 1972, seeking damages on behalf of themselves and at least 7,000 other individuals. The defendants were several federal officials, including then Attorney General John Mitchell and then Deputy Attorney General Richard Kleindienst, the District of Columbia, and several of its officials. The lawsuit challenged the legality of defendants'

Willard K. Tom, Washington, D.C., with whom Stephen Yale-Loehr, Francis M.

actions taken in response to "May Day" demonstrators' well-publicized plans to close down the city of Washington on May 3, 1971. According to the complaint, defendants' actions in responding to the "May Day" demonstrations violated the constitutional and common law rights of the named plaintiffs and putative class members.

The gravamen of the complaint was that federal and local law enforcement officials had conspired to engage in illegal tactics to combat the "May Day" demonstrations planned in protest against the Vietnam War. Complaint ¶¶ 23, 24. Specifically, the complaint challenged the decision, effective early in the morning of May 3, 1971, of then Police Chief Jerry Wilson, of the Metropolitan Police Department, to suspend field arrest procedures. Those procedures normally required the completion of an arrest form and the taking of a contemporaneous photograph of each arrestee. Id. ¶ 25. Plaintiffs alleged that this suspension. of field arrest procedures led to thousands of illegal arrests throughout the city on May 3 by officers of the Metropolitan Police Department and the United States Park Police. . Id. ¶ 27. Plaintiffs also alleged that the defendants had used, or were responsible for the use of, excessive force against putative class members. Id. ¶¶ 28, 29. Plaintiffs further alleged that members of the putative class had been illegally detained at more than ten places of confinement throughout the city. Id. ¶¶ 30, 31. The conditions of confinement obtaining at these locations were also challenged. Id. ¶¶ 32–35. Finally, plaintiffs alleged that the defendants had subjected putative class members to "cumbersome processing procedures," such as booking and fingerprinting, and to unfounded criminal prosecutions in order to penalize them for demonstrating against the Nation's Southeast Asian policy. Id. ¶¶ 36–41.

These factual allegations translated into a variety of legal causes of action: plaintiffs asserted constitutional claims under the First, Fourth, Fifth, Sixth, and Eighth amendments, in addition to common-law tort claims such as false arrest, malicious prosecution, abuse of process, and conspiracy. Id. ¶¶ 1, 2. Most significantly for present purposes, the complaint contained class action allegations. Id. ¶¶ 19–23. As previously indicated, the thirty-nine named plaintiffs sought to represent a class consisting of at least 7,000 individuals whose rights were allegedly violated by the federal and local defendants on May 3, 1971. Id. ¶ 20.[1] To foreshadow the pivotal events to come, we note here in passing that as the litigation comes to us, none of the original named plaintiffs and potential class representatives is still a party in this case.

The defendants filed their respective answers to plaintiffs' complaint in August 1972. After some procedural skirmishing and the taking of limited discovery, certain of the federal defendants, namely Messrs. Mitchell, Kleindeinst and then Assistant Attorney General Will Wilson, moved for summary judgment on the ground that they were *absolutely* immune from damages lawsuits arising out of actions taken in their official capacities. The District Court granted summary judgment as to these defendants on July 31, 1973, and plaintiffs immediately filed a notice of appeal. On October 12, 1973, the District Court stayed all further proceedings in the case pending appellate resolution of the matter. Approximately three months later, this court issued an unpublished order dismissing the appeal for want of jurisdiction, *McCarthy v. Bork*, No. 73–2023 (D.C.Cir. Jan. 14, 1974), and the stay of proceedings

---

1. The original plaintiffs also sought to represent a "class consist[ing] of a presently undetermined number of persons, who upon information and belief, will be subjected by defendants to violations of their Constitutional, statutory, and common law rights...." Complaint ¶ 21. Appellants do not appear to contest the District Court's denial of certification with respect to this class and, in any event, it is problematic whether under governing law any member of this class would have standing to seek declaratory or injunctive relief. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 1667, 75 L.Ed.2d 675 (1983).

in the District Court thereupon expired by its own terms.

While the *McCarthy* plaintiffs were unable to persuade this court to determine whether the federal defendants were shielded by absolute immunity, the plaintiffs in a *separate* "May Day" case were subsequently able to obtain such a determination in the context of an appeal from a final judgment. In *Apton v. Wilson*, 506 F.2d 83, 90–95 (D.C.Cir.1974), a case involving several of the federal defendants sued in *McCarthy*, this court rejected the argument that the federal defendants were protected by absolute immunity, holding instead that they were entitled only to qualified immunity. In light of *Apton*, the District Court vacated the summary judgment as to the federal defendants in the *McCarthy* case on July 3, 1975.

On July 25, 1975, over three years after the inception of this lawsuit, the *McCarthy* plaintiffs moved for certification of a class comprised of all persons arrested and detained in the District of Columbia on May 3, 1971. The District Court issued an order denying class certification on September 11, 1975. Four reasons were advanced by the District Court for its action:

> (1) [P]laintiffs' Motion for Certification of a Class was not timely filed, (2) such certification would at this late date further delay the action and necessitate further discovery, (3) this action on the merits does not lend itself to such class action certification, and (4) the particularized facts involved in each plaintiffs' [sic] arrest and detention preclude class action treatment.

*McCarthy v. Kleindienst*, C.A. No. 844–72 (D.D.C. Sept. 11, 1975) (reprinted in Joint Appendix, at 133).

Upon the District Court's denial of class certification, 266 individuals ("the Abelman intervenors") promptly sought, but were denied, leave to intervene in the lawsuit. On appeal, this court held that the Abelman intervenors should have been granted leave to intervene and to assert their substantive claims against defendants. *McCarthy v. Kleindienst*, 562 F.2d 1269, 1271–75 (D.C.Cir.1977).[2] The Abelman intervenors also requested that this court determine whether the original plaintiffs' motion for class certification had been wrongly denied, but the court rejected this invitation on the ground that the denial of class certification was not then an appealable order. *Id.* at 1276.

Meanwhile, the federal defendants had again moved for summary judgment in the District Court, and on May 23, 1979, the court granted this motion. In a memorandum opinion, the District Court held that the federal defendants' actions were within the scope of their *qualified* immunity. In an alternative holding, the court noted that two of the federal defendants, namely Messrs. Mitchell and Wilson, were also entitled to summary judgment on the ground that plaintiffs had never properly served process upon them.

With the federal defendants out of the case as of 1979, the parties undertook settlement negotiations that ultimately proved successful, resulting in the dismissal of the "May Day" claims of all the original thirty-nine named plaintiffs and all Abelman intervenors. When it became clear that neither the original plaintiffs nor the Abelman intervenors could adequately protect the interests of the putative class, another group of putative class members ("the Waskow intervenors" or "appellants") sought leave to intervene for purposes of appealing the denial of class certification.

**2.** This court held that the Abelman intervenors' right to assert certain substantive claims against defendants could be limited if defendants were able specifically to demonstrate prejudice. That demonstration could, the court held, be made by showing that the original plaintiffs' complaint did not provide adequate notice regarding the types of claims asserted by the intervenors. 562 F.2d at 1275. On remand, the parties hotly contested whether full intervention should be permitted, or whether defendants had made a sufficient showing of prejudice to warrant limiting the Abelman intervenors' rights to assert certain substantive claims. By virtue of a supervening settlement, the District Court never had occasion to resolve the extent of the Abelman intervenors' intervention rights.

Although the District Court originally denied leave to intervene, this court subsequently reversed that denial. *McCarthy v. Kleindienst*, No. 81–1738 (D.C.Cir. July 26, 1982). On June 24, 1983, the District Court on remand entered an order that allowed intervention, but simultaneously dismissed the case. It is thus this latter group of intervenors who are maintaining the instant appeal.

## II

The Waskow intervenors challenge the District Court's decision not to certify this case as a class action. Our consideration of this challenge is appropriately undertaken only against the backdrop of a proper understanding of the respective roles of trial and appellate courts in class certification decisions.

▮ It is, of course, well established that a principal purpose of the class-action mechanism is to advance the efficiency and economy of multi-party litigation. *See, e.g., General Telephone Company of the Southwest v. Falcon*, 457 U.S. 147, 155, 102 S.Ct. 2364, 2369, 72 L.Ed.2d 740 (1982) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 701, 99 S.Ct. 2545, 2557, 61 L.Ed.2d 176 (1979)); *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 553, 94 S.Ct. 756, 766, 38 L.Ed.2d 713 (1974). It necessarily follows, therefore, that trial courts, charged with the orderly management of litigation, are uniquely well situated to make class certification decisions. *See Burns v. United States Railroad Retirement Board*, 701 F.2d 189, 191 (D.C.Cir. 1983) (court of appeals declined to make class certification decision in the first instance because the "appellate mode of proceeding is not compatible with designation and management of a class"); *cf. Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100, 101 S.Ct. 2193, 2200, 68 L.Ed.2d 693 (1981) ("a district court has both the duty and the broad authority to exercise control over a class action"); *Cloverleaf Standardbred Owners Association v. National Bank of Washington*, 699 F.2d 1274, 1277 (D.C.Cir.

1983) (adopting abuse of discretion standard to govern district court dismissals pursuant to *Fed.R.Civ.P.* 19(b)) ("A district judge, closer to the arena, is often better suited than is an appellate panel to survey the practicalities involved in the litigation.") (quotation omitted). While class certification decisions are manifestly too important to be insulated from appellate review, an appellate court may reverse a district court's denial of class certification only if the denial resulted from the application of incorrect legal criteria or if it constituted an abuse of discretion. *Bermudez v. United States Department of Agriculture*, 490 F.2d 718, 725 (D.C.Cir.), *cert. denied*, 414 U.S. 1104, 94 S.Ct. 737, 38 L.Ed.2d 559 (1973); *see also National Association for Mental Health, Inc. v. Califano*, 717 F.2d 1451, 1459 (D.C.Cir.1983); *Moore v. Hughes Helicopters, Inc.*, 708 F.2d 475, 479 (9th Cir.1983). This deferential standard means that an appellate court may well affirm a district court's decision with respect to class certification *vel non* even though the appellate court would have ruled differently in the first instance. *See Shroder v. Suburban Coastal Corp.*, 729 F.2d 1371 at 1374 (11th Cir.1984).

It is elementary that four prerequisites must be satisfied for a class action under Rule 23(a): "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." *Fed.R.Civ.P.* 23(a). In the present case, it is conceded that the numerosity requirement is satisfied. We turn, then, to the three remaining requirements. Those interrelated prerequisites serve as "guideposts" for determining whether the respective claims are sufficiently similar that a class action will serve as an efficient litigation control device that adequately protects the interests of absent class members. *Falcon, supra*, 457 U.S. at 157· n. 13,

102 S.Ct. at 2371 n. 13.[3] In light of the fact that this case was brought as a *damages* action, however, the dispositive class certification issues are whether the common questions of law or fact "predominate over any questions affecting only individual members, and [whether] a class action is superior to other available methods for the fair and efficient adjudication of the controversy." *Fed.R.Civ.P.* 23(b)(3).

Essentially, the District Court relied upon two considerations in concluding that the present case should not be certified as a class action. First, the court found that plaintiffs' motion for class certification was untimely and that unwarranted further delay and massive discovery would necessarily result from certification. Second, the court found that this case was not amenable to resolution on a classwide basis in light of "the particularized facts involved in each plaintiffs' [sic] arrest and detention...." We now examine these determinations under the governing standard of review, as set forth above.

### III

#### A

■ The first rationale advanced by the District Court was that further delay would be occasioned by treatment of this case as a class action. At the time plaintiffs initially moved for class certification, this case was already over three years old and defendants still had no idea whether they were facing thirty-nine plaintiffs or at least 7,000 plaintiffs. Furthermore, although the case had been pending for over three years at the time, the case was virtually at square one with respect to proceeding to an eventual determination on the merits.

Notwithstanding these considerations, appellants argue that it was an abuse of discretion for the District Court to rely upon the untimeliness of the class certification motion as a reason for denying it. We cannot agree.

■ Initially, we observe that Local Rule 1–13(b) of the District Court, which took effect on August 1, 1973, requires putative class plaintiffs to move for class certification within ninety days after filing their complaint. While we utterly reject the suggestion that Local Rule 1–13(b) *directly* governs a case, such as the one before us, filed before the rule's effective date, *see McCarthy v. Kleindienst*, 562 F.2d 1269, 1273 n. 1 (D.C.Cir.1977), it would manifestly be within the District Court's discretion to refer to the rule as a non-binding benchmark against which the timeliness of a class certification motion could be measured. *Cf. Dudo v. Schaffer*, 91 F.R.D. 128, 136 (E.D.Pa.1981) (although the local rule requiring class certification motion to be filed within 90 days of complaint was not directly applicable, the court found that plaintiffs' 11½ month delay violated the "spirit" of the rule), *reh'g denied*, 93 F.R.D. 524 (E.D.Pa.1982). Indeed, this court has noted that Local Rule 1–13(b) "implements the policy" behind the already extant requirement of *Fed.R.Civ.P.* 23(c)(1) that class certification decisions be made "as soon as practicable." *Black Panther Party v. Smith*, 661 F.2d 1243, 1279 (D.C. Cir.1981), *vacated mem.*, 458 U.S. 1118, 102 S.Ct. 3505, 73 L.Ed.2d 1381 (1982).[4]

■ In our view, *Fed.R.Civ.P.* 23(c)(1) and Local Rule 1–13(b) rest upon at least two fundamental policies. The first is that defendants are entitled to ascertain at the

---

3. The fourth prerequisite, in addition to addressing the general considerations outlined in the text, "also raises concerns about the competency of class counsel and conflicts of interest." *Falcon, supra*, 457 U.S. at 157–58 n. 13, 102 S.Ct. at 2371 n. 13.

4. In *Black Panther Party*, this court reversed a district court dismissal of a lawsuit based upon plaintiffs' refusal to respond to interrogatories. 661 F.2d at 1247. Although the court thus or-

dered that plaintiffs' claims be reinstated, it upheld the District Court's denial of class certification on untimeliness grounds. *Id.* at 1279. The Supreme Court subsequently vacated this court's decision, and ordered that the case be dismissed. 458 U.S. 1118, 102 S.Ct. 3505, 73 L.Ed.2d 1381. Thus, the Supreme Court's action in vacating the case was entirely unrelated to the class certification issue.

earliest practicable moment whether they will be facing a limited number of known, identifiable plaintiffs or whether they will instead be facing a much larger mass of generally unknown plaintiffs. Fundamental fairness, as well as the orderly administration of justice requires that defendants haled into court not remain indefinitely uncertain as to the bedrock litigation fact of the number of individuals or parties to whom they may ultimately be held liable for money damages. That is particularly true where, as here, the defendants were facing either thirty-nine named plaintiffs or a class of almost two hundred times the number of the original plaintiffs. Second, these rules foster the interests of judicial efficiency, as well as the interests of the parties, by encouraging courts to proceed to the merits of a controversy as soon as practicable. That, at bottom, is a matter of simple justice. As previously described, plaintiffs' three-year delay in moving for class certification indisputably thwarted these policies.[5]

We recognize that a party's delay in moving for class certification has generally been analyzed with reference to the adequacy-of-representation requirement, *see, e.g., East Texas Motor Freight System,*

*Inc. v. Rodriguez,* 431 U.S. 395, 404–05, 97 S.Ct. 1891, 1897, 52 L.Ed.2d 453 (1977), and that the record contains no finding that the plaintiffs were unable adequately to represent the class. Nevertheless, we believe it was within the District Court's broad discretion to rely upon the untimeliness of the class certification motion, and the unfavorable consequences caused by the delay, as grounds for denying certification. But we need not, and do not, decide whether these considerations alone were sufficient to support the District Court's denial of certification, inasmuch as the court below also grounded its decision upon its view that plaintiffs' claims were not suitable for resolution on a classwide basis. · It is to this consideration that we now turn.

### B

▪ The second rationale advanced by the District Court was that the particularized facts involved in each plaintiff's arrest and detention precluded maintenance of a class action for damages. In order to assess this ground for the District Court's denial, we are called upon to examine the causes of action asserted in the complaint on behalf of the putative class.[6] We must

---

**5.** Appellants' latter-day explanations for the original plaintiffs' delay in moving for certification are woefully unconvincing. Essentially, appellants argue that it would have been wasteful for the original plaintiffs to move for certification while the propriety of the District Court's grant of summary judgment in favor of the federal defendants was still unsettled. Appellants also attempt to support the delay by relying upon the fact that the District Court stayed all proceedings in the case pending plaintiffs' appeal to this court from the summary judgment order. By its own terms, however, *the District Court's stay was in effect for only three of the thirty-six months of delay at issue.* Furthermore, the uncertainty with respect to the grant of summary judgment involved *only* the federal defendants. In light of the fact that the class was going to be the same against both the federal and the District of Columbia defendants, there simply was no sound reason for awaiting the removal of this uncertainty before moving for certification. *Cf. Coffin v. Secretary of Health, Education and Welfare,* 400 F.Supp. 953, 956–57 & n. 19 (D.D.C.1975) (three-judge court) (plaintiff's failure to move timely for class certification was not excused by the asserted need to

respond to defendant's motions to dismiss the case, to transfer the case, and to dissolve the three-judge court), *appeal dismissed,* 430 U.S. 924, 97 S.Ct. 1539, 51 L.Ed.2d 789 (1977); *Black Panther Party, supra,* 661 F.2d at 1279 (citing *Coffin* with approval on this point).

**6.** Appellants seem to argue that a court may not decide, in the context of a class certification determination, what plaintiffs must demonstrate in order to prevail on their legal theories of liability. Brief for Appellants, at 21 (citing *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732 (1974)). The pertinent aspect of the *Eisen* holding is that courts lack the authority to conduct a fact-based preliminary hearing regarding the merits of the lawsuit at the class certification stage. Nothing in *Eisen* precludes a court from scrutinizing plaintiffs' legal causes of action to determine whether they are suitable for resolution on a classwide basis. To the contrary, such scrutiny is ordinarily an essential ingredient of the determination whether to allow a case to proceed as a class action. *See, e.g., Coopers & Lybrand v. Livesay,* 437 U.S. 463, 469 & n. 12, 98 S.Ct. 2454, 2458 & n. 12, 57 L.Ed.2d 351 (1978); *Moore v.*

then determine whether the District Court abused its discretion in deciding that a class action was not the best method for resolving this controversy because legal and factual questions common to the putative class did not predominate over those questions affecting only individual members.

Although the original plaintiffs asserted a number of causes of action, these causes of action have never been adequately developed; to this day, appellants are somewhat vague as to the legal foundations for their theories of liability. We will examine what appear to be the two principal causes of action asserted in the present case: false arrest and abuse of process.[7]

■ While the false arrest claim is asserted under both the Fourth Amendment and the common law, the requisite elements in both cases are that the plaintiff was arrested against his will and that the arrest was unlawful. *Dellums v. Powell*, 566 F.2d 167, 175 (D.C.Cir.1977), *cert. de-*

nied, 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978); *Faniel v. Chesapeake & Potomac Telephone Co.*, 404 A.2d 147, 150 (D.C.1979) (quoting *Tocker v. Great Atlantic & Pacific Tea Co.*, 190 A.2d 822, 824 (D.C.1963)). Unlawfulness is presumed in cases where the arrest took place without a warrant. *Dellums, supra*, 566 F.2d at 175-76; *District of Columbia v. Gandy*, 450 A.2d 896, 900 (D.C.), *modified on other grounds*, 458 A.2d 414 (D.C.1982), *reh'g en banc denied*, 466 A.2d 851 (D.C.1983). The defendant may then rebut this presumption of unlawfulness by demonstrating that probable cause existed for the arrest. *Dellums, supra*, 566 F.2d at 175; *Gabrou v. May Department Stores*, 462 A.2d 1102, 1104 (D.C.1983) (per curiam). It is thus apparent that the liability determination in the present case is likely to turn upon highly individualized proof, inasmuch as probable cause may have existed for the arrest of some putative class members but have been lacking with respect to others.[8]

---

*Hughes Helicopters, Inc., supra*, 708 F.2d at 480; *Doctor v. Seaboard Coast Line R.R.*, 540 F.2d 699, 707 (4th Cir.1976).

7. The complaint also contained broad conspiracy allegations against appellees. These conspiracy allegations, however, do not set forth an independent cause of action; instead, such allegations are sustainable only after an underlying tort claim has been established. *See Halberstam v. Welch*, 705 F.2d 472, 479 (D.C.Cir.1983) ("Since liability for civil conspiracy depends on performance of some underlying tortious act, the conspiracy is not independently actionable; rather, it is a means for establishing vicarious liability for the underlying tort."). In the context of the present case, for example, individuals alleging false arrest must prove that they were unlawfully arrested in order for their conspiracy claims to become cognizable. We therefore do not understand the dissent's suggestion, *see* Dissenting Opinion at 1421, that our reasoning would favor resolution of the conspiracy allegations on a classwide basis while at the same time disfavor classwide resolution of the false arrest claims. Contrary to the dissent's approach, the conspiracy allegations cannot be viewed separately from the underlying tort claims in the present case. If the District Court did not abuse its discretion in deciding against classwide resolution of the underlying tort claims, the fact that the complaint also contained conspiracy allegations is not an independent basis for reversal.

8. Appellants' arguments against this proposition are unconvincing. First, appellants argue that some of the District of Columbia appellees may be collaterally estopped from attempting to establish probable cause as a defense by reason of the decision against them in *Sullivan v. Murphy*, 380 F.Supp. 867 (D.D.C.1974) (on remand from 478 F.2d 938 (D.C.Cir.), *cert. denied*, 414 U.S. 880, 94 S.Ct. 162, 38 L.Ed.2d 125 (1973)). In *Sullivan*, this court held that certain arrests, including those made on May 3, 1971, were presumptively invalid subject to a demonstration of validity on remand. On remand, the District of Columbia defendants were unable to demonstrate probable cause, and the arrests were accordingly declared invalid. Contrary to appellants' arguments here, however, *Sullivan* should not be read to preclude the District of Columbia appellees from attempting to justify the arrests. *Sullivan* was a suit limited solely to equitable relief (i.e., expungement of arrest records); the stakes in the present case are much different given the claims for money damages. The greater incentive to litigate in this case militates strongly against giving *Sullivan* preclusive effect. *See, e.g., Otherson v. Department of Justice, I.N.S.*, 711 F.2d 267, 275-76 (D.C.Cir.1983).

Appellants' second argument is that the *Sullivan* remand at least indicates that appellees' contention that probable cause may be established as a defense in individual cases is plausible in theory but not in accord with the actual

The second primary cause of action, and the one most emphasized by appellants, is for abuse of process. To prevail on this claim, appellants must demonstrate that: (1) appellees were motivated by an ulterior purpose in bringing legal proceedings against them, and (2) the proceedings resulted in "a perversion of the judicial process and achievement of some end not contemplated in the regular prosecution of the charge." *Morowitz v. Marvel*, 423 A.2d 196, 198 (D.C.1980). The existence of probable cause is not a defense to an abuse of process claim. *Chatterton v. Janousek*, 280 F.2d 719, 721 (D.C.Cir.), *cert. denied*, 364 U.S. 902, 81 S.Ct. 235, 5 L.Ed.2d 195 (1960); *Williams v. City Stores Co.*, 192 A.2d 534, 537 (D.C.1963);

*see also* W. PROSSER, LAW OF TORTS 856 (4th ed. 1971). The essence of the tort, however, lies in the misuse of *judicial* proceedings. *See, e.g., Foothill Industrial Bank v. Mikkelson*, 623 P.2d 748, 758 (Wyo.1981); *Jones v. Brockton Public Markets, Inc.*, 369 Mass. 387, 340 N.E.2d 484, 485–86 (1975); *Barquis v. Merchants Collection Association*, 7 Cal.3d 94, 101 Cal.Rptr. 745, 752, 496 P.2d 817, 824 (1972). While abuse of process claims may thus conceivably be susceptible of resolution on a classwide basis in cases where it is alleged that defendants abused the judicial process as part of a common scheme, the problem in the present case is that it is unclear how many putative class members were allegedly victimized by abuses of the judicial process.[9]

circumstances here. This argument, however, ignores the fact that appellees may be able to conduct discovery that would help establish their defenses. More importantly, a finding that appellees would be unable ultimately to establish facts sufficient to support their defenses would be impermissible at this stage of the proceedings. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732 (1974) (court may not "conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action"). Courts have properly recognized that *Eisen* does not preclude consideration of matters beyond the pleadings to determine whether a claim or defense, *assuming its merit,* is susceptible of resolution on a classwide basis. *See, e.g., Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 570–72 (2d Cir.), *cert. denied,* 459 U.S. 838, 103 S.Ct. 86, 74 L.Ed.2d 80 and 459 U.S. 908, 103 S.Ct. 213, 74 L.Ed.2d 170 (1982); *Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130,* 657 F.2d 890, 895 (7th Cir. 1981), *cert. denied,* 455 U.S. 1017, 102 S.Ct. 1710, 72 L.Ed.2d 134 (1982); *Doctor v. Seaboard Coast Line R.R.,* 540 F.2d 699, 707–09 (4th Cir.1976). We strongly disagree, however, with our dissenting colleague's suggestion, Dissenting Opinion at 9, that the District Court could have concluded, consonant with *Eisen,* that "probable cause could [not] be demonstrated for a significant number of the 8000 arrests at issue." Whether probable cause existed for individual arrests would likely be *the* central issue in the liability phase of any trial of this case; it would not have been proper for the District Court to conclude in the context of its class certification determination that the probable cause defense lacked merit.

**9.** For example, while it appears that many putative class members were alleged victims of un-

lawful arrests and detentions, warrantless arrests and detentions effectuated entirely *independent* of the judicial process could not support an abuse of process tort claim. The original plaintiffs never demonstrated, and to this date appellants are unable to demonstrate, how many putative class members actually had judicial process invoked against them.

The dissent argues that our approach with respect to the abuse of process claim "drastically alters the burden of proof for class certification questions." Dissenting Opinion at 1421. This criticism is somewhat difficult to fathom inasmuch as it is the party seeking class certification that bears the burden of establishing the class action requirements. *Eggleston v. Chicago Journeymen Plumbers' Local Union No. 103,* 657 F.2d 890, 895 (7th Cir.1981), *cert. denied,* 455 U.S. 1017, 102 S.Ct. 1710, 72 L.Ed.2d 134 (1982); *Doctor v. Seaboard Coast Line R.R.,* 540 F.2d 699, 706–07 (4th Cir.1976); *see generally* 3B J. Moore & J. Kennedy, *Moore's Federal Practice* ¶ 23.02–2, at 23–96 (2d ed. 1982). The dissent's recommendation that subclasses be employed as to this issue would be deserving of serious consideration had it been suggested to the District Court; it was not. Our opinion manifestly should not be read as precluding creative uses of Rule 23 by district judges attempting fairly and efficiently to resolve complex litigation. We do not believe, however, that an appellate court, thirteen years after the inception of litigation, should be in the business of creating classes and subclasses never suggested by the parties seeking certification.

The complaint also contained a claim that the activities complained of were taken in order to penalize putative class members for the exercise of their First Amendment right to demonstrate. Such a claim, while somewhat akin to the commonlaw abuse of process claim in that plaintiffs

We now turn to an examination of whether the District Court clearly erred in determining that a class action was not the superior method for resolving plaintiffs' claims. It is apparently conceded that damages may vary greatly among putative class members. Appellants argue, however, that the mere fact that damage awards will ultimately require individualized fact determinations is insufficient by itself to preclude class certification. We agree. A district court should, of course, ordinarily consider such well-established methods as bifurcating the trial into liability and damages phases before denying certification. *See, e.g., Hill v. Western Electric Co.,* 672 F.2d 381, 387 (4th Cir.), *cert. denied,* 459 U.S. 981, 103 S.Ct. 318, 74 L.Ed.2d 294 (1982); *Samuel v. University of Pittsburgh,* 538 F.2d 991, 995–96 (3d Cir.1976); *Developments in the Law— Class Actions,* 89 Harv.L.R. 1318, 1491–92 (1976).

On the other hand, serious drawbacks to the maintenance of a class action are presented where initial determinations, such as the issue of liability *vel non,* turn upon highly individualized facts. *See, e.g., Windham v. American Brands, Inc.,* 565 F.2d 59, 65–72 (4th Cir.1977) (en banc), *cert. denied,* 435 U.S. 968, 98 S.Ct. 1605, 56 L.Ed.2d 58 (1978). That is precisely the situation here, where arrests were made in numerous locations in the District of Columbia and where the duration and conditions of confinement varied greatly.[10] We are therefore unable to conclude that it has been clearly demonstrated, in a manner sufficient to warrant our overturning the District Court's determination to the contrary,[11] that a class action was the superior method for resolving this controversy.

## IV

Even apart from the class certification issue, there is an additional ground upon which we affirm the District court's dismissal of the case with respect to the federal defendants. Appellants first sought leave to intervene in this action

must establish that defendants had an impermissible purpose behind seemingly legitimate actions, is broader than the common-law claim in one respect, because it would conceivably extend beyond actions implicating the judicial process. On the other hand, the First Amendment claim would at the same time be narrower than the common-law claim, inasmuch as defendants would conceivably be able to avoid liability by demonstrating that they would have taken the challenged actions even absent the impermissible purpose. *Cf. Mt. Healthy City Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977) (defendant may rebut prima facie case that otherwise legitimate action was taken to penalize plaintiff for exercise of First Amendment right by demonstrating that it would have taken the same action even absent the impermissible consideration). The possible existence of this individualized defense militates against resolution of this cause of action on a classwide basis.

10. Appellants' reliance upon the abuse of process claim in support of their argument that the District Court erred in not certifying a class is extremely unconvincing. *See supra* note 9 and accompanying text. We would not be justified in reversing the District Court simply because one of the many causes of action asserted in the complaint could conceivably present common questions as to an undefined sub-group within the overall putative class.

11. The need to defer to a district court's class certification decision has been greatly emphasized throughout this opinion. It is this factor that makes our decision in the present case entirely consistent with both *Dellums v. Powell,* 566 F.2d 167 (D.C.Cir.1977), *cert. denied,* 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978) and *Sullivan v. Murphy,* 478 F.2d 938 (D.C.Cir.), *cert. denied,* 414 U.S. 880, 94 S.Ct. 162, 38 L.Ed.2d 125 (1973), previous "May Day" cases in which this court *upheld* district court decisions to certify a class. While there are other important distinctions between those cases and the present one (e.g., the class in *Dellums* consisted only of those persons arrested on the steps of the U.S. Capitol, a much more cohesive group than the approximately 7,000 putative class members here who were arrested throughout the city; *Sullivan* was brought as a "(b)(2)" class action involving equitable relief only rather than as a "(b)(3)" damages class action), we view the most significant distinction as the fact that in neither *Dellums* nor *Sullivan* was the court required to uphold a class by reversing a district court's determination. We are by no means holding today that it would have been error to certify a class in this case, and that question is obviously not before us. Instead, we are simply holding that the District Court did not abuse its ample discretion in declining to certify a class under the circumstances present here.

during the Spring of 1981 when it began to appear that impending settlements would preclude the original plaintiffs and the Abelman intervenors from adequately representing the putative class. In seeking to become parties to this action for purposes of appealing the class certification denial, appellants served copies of their intervention motion upon the District of Columbia, *but not the federal,* defendants. After the District Court denied them leave to intervene, appellants served their appellate briefs challenging the denial upon the District of Columbia, *but not the federal,* defendants. It was not until 1983, over two years after they filed their original intervention motion, that appellants expressly manifested an intent to pursue their claims against the federal defendants.

It is beyond cavil that persons seeking to intervene in an ongoing action must serve a copy of their motion to intervene upon the parties to the action. *Fed.R.Civ.P.* 24(c). While recognizing that procedural defects in connection with intervention motions should generally be excused by a court, *see* C. WRIGHT, LAW OF FEDERAL COURTS 507 n. 44 (4th ed. 1983), in our view, appellants' two-year inaction with respect to the federal defendants was sufficiently grievous to warrant dismissal of the federal defendants from the case.

We are able to envision only two explanations for appellants' consistent failure to serve their intervention papers upon the federal defendants. The first is that appellants made a conscious decision in 1981 not to pursue their claims against the federal defendants. The second possible explanation is that appellants' consistent failure, over a two-year period, to serve the federal defendants with intervention papers was mere oversight.

Under either hypothesis, dismissal would be warranted. For almost ten years after the actions that allegedly gave rise to their injuries, appellants slept on their individual rights. During that same time period, the defendants were forced to defend against the claims of the thirty-nine original plaintiffs and, after 1975, the 266 Abelman intervenors. In 1981, the defendants were finally able to envision an end to this "May Day" litigation when the District of Columbia entered into settlements with these approximately 300 individuals. While appellants were clearly entitled to intervene at that point, *see United Airlines, Inc. v. McDonald,* 432 U.S. 385, 97 S.Ct. 2464, 53 L.Ed.2d 423 (1977), such a right of intervention in favor of parties who have slept on their other legal rights for ten years is extraordinary. Under these circumstances, it is not unfair to require that such intervenors clearly and unequivocally indicate the entire universe of parties against whom intervention is sought. Every indication in the present case was that these latter-day litigants, in succeeding to the litigation responsibilities of their predecessors, no longer intended to pursue claims against the federal defendants. Thus, regardless of whether appellants' inactions with respect to the federal defendants resulted from a conscious decision or instead resulted from oversight, the federal defendants were entitled to assume after 1981 that they would no longer have to answer in a court of law for actions taken in May 1971.

We are persuaded that it would be a manifest injustice to allow appellants now to assert their claims against the federal defendants. Accordingly, we affirm the District Court's dismissal of the case with respect to the federal defendants on this alternative ground as well.

## V

For the foregoing reasons, we affirm the District Court's decision not to certify a class. We further hold that appellants failed properly to intervene as against the federal defendants. Accordingly, the District Court's dismissal of the case is

*Affirmed.*

MIKVA, Circuit Judge, concurring in part and dissenting in part:

Whatever can be said of hard cases is equally pertinent to old cases. This dispute, vintage 1971, is before this court on questions that are yet at the threshold

stage. Tempting as it might be to find a rug under which this case might be swept, I think it makes bad law. I dissent from that part of the majority's opinion which denies the parties the right to proceed as a class. I believe the court is wrong in holding that the questions of law and fact common to the members of the putative class in this case do not sufficiently predominate over questions affecting only individual members as to warrant class certification. To explain my basis for dissenting, it is necessary to develop the facts of this litigation in somewhat more detail than found in the majority's opinion.

The case involves another piece of the troublesome response taken by government officials to the "May Day" demonstrations against the Vietnam War in 1971. The "field arrest procedures" referred to by the majority were designed to deal with massive civil disorders in the District of Columbia. These procedures contemplated that after an arrest the arresting officer would complete a Field Arrest Form by filing in the officer's name, unit and badge number, the identity of the arrestee, and the circumstances of the arrest. A photograph of the arrestee and the arresting officer together was also to be taken at the scene. Thereafter, the arrestee would be transferred to other police personnel for removal from the scene and booking, allowing the arresting officer to return to duty. The procedures also provided for expeditious post-arrest processing, in which the completed arrest forms and Polaroid photos would be accepted by the local courts as evidence of probable cause in lieu of direct testimony by the arresting officer.

With this expedited arrest and booking procedure in place, the Washington Police Department faced the antiwar demonstrations of late April and early May, 1971. In the initial stages of these demonstrations, prior to May 3, 1971, the Police Department arrested several hundred demonstrators throughout the city. In doing so, they initially adhered to the field arrest procedures described above. At 6:23 a.m. on May 3, 1971, however, defendant Jerry Wilson, then Chief of the Washington Metropolitan Police Force, issued an order suspending the field arrest procedures. This suspension remained in effect until May 4, 1971, at 5:40 a.m.

During this period, nearly 8,000 people were arrested. Having foregone the use of formal arrest procedures, however, the police lacked any records by which to establish probable cause. Accordingly, they initiated special booking procedures under which volunteer attorneys from the Department of Justice were instructed to:

> record the name, address and physical description of each arrestee. In the blank marked 'Original Charge' they were instructed to enter the words 'Disorderly Conduct'. At their initial briefing, they had been given a list containing the names, badge numbers and unit designations of seven police officers. Under the caption 'Name of Arresting Officers,' they were told to insert 'one name taken seriatim from [this] list of seven'; and they were specifically told to leave blank that portion of the form in which the circumstances of arrest were to be recorded.

*Sullivan v. Murphy*, 478 F.2d 938, 951 (D.C.Cir.1973). Following their arrest, the arrestees were crowded, some for as long as seventy hours, into detention centers around the city.

In *Sullivan v. Murphy*, a class action brought on behalf of all those arrested without field arrest forms, we declared all of these nearly 8,000 arrests presumptively unlawful under the fourth amendment; without photographs and field arrest forms, the police simply could not as a general matter establish probable cause. We noted, however, that if probable cause could be proven in any particular case on remand, that particular arrest would be lawful. The government stated on remand that "an affirmative showing of probable cause [could] not be made in any of the pertinent cases" and therefore a final order was issued by the district court declaring all the arrests invalid. 380 F.Supp. 867, 868 (D.D.C.1974). Every member of the

putative class in this case was a member of the class in *Sullivan* and hence the arrest of every individual in the class is presumptively unlawful. Against this background, I now turn to the legal issues presented by this case.

## I.

I agree with the majority that, while procedural defects in intervention motions should generally be excused, in the context of this case the failure to serve the intervention motion on the federal defendants for two years justifies dismissing the case against these defendants.

Because the majority concludes that the case against the federal defendants should be dismissed on this ground, I assume that the majority's discussion about the suitability of class treatment applies to only the claims against the District of Columbia and its local officials. Were this discussion intended to cover the federal defendants as well, it would be particularly troubling, for it seems indisputable that the dominant question with respect to the federal defendants would be the extent to which they were involved in and can be held responsible for the actions of local officials on May 3, 1971. That question, in my view, would make class treatment appropriate for the suit against the federal defendants. I do not read the majority opinion as expressing any view on the merits of a class suit against the federal defendants, however, and therefore address myself to only the class allegations against the District and its officials.

## II.

The class action mechanism set forth in the Federal Rules of Civil Procedure is an intensely practical device, designed, as the majority notes, to foster efficient and economical multi-party litigation. Indeed, the very purpose of the major revisions made in 1966 to the class action rules was to "substitute functional tests for the conceptualisms that characterized practice under the former rule." 7 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE

§ 1753, at 538 (1972). To determine whether class treatment is appropriate, therefore, it is necessary to look to the realities of the litigation and to assess whether, as a practical matter rather than as an abstract inquiry, class treatment is the most efficient means of conducting the action. "The proper standard [for determining whether a class action should be certified] under Rule 23(b)(3) is a pragmatic one." 7A *Id.* § 1778, at 53.

The majority seems to recognize these principles in explaining its conclusion that class certification decisions are to be reviewed under an abuse of discretion standard. Yet the majority completely turns its back on these principles a mere two pages later when it states that a court is foreclosed from considering whether, as a practical matter, individual defenses to the action are likely to be real factors at trial. *See* Maj.Op. at n. 8. Instead, as the majority would seem to have it, as long as such defenses exist in theory and as an abstract possibility, they are enough to allow a trial judge to refuse to certify an action that, pragmatically viewed, would best be run as a class suit. There is no legal or logical basis for such an impractical result.

To determine whether common questions predominate a trial judge must inevitably make some effort to assess the realities of a lawsuit and to assay the issues that are likely actually to be in contention. For example, if several defenses are raised to a class complaint, some of which apply to the entire class and some of which are more individualized, the trial judge will of necessity have to make some judgment on which defenses the lawsuit is likely to turn. That judgment obviously will require a realistic appraisal and estimation of the number of individuals to whom the particularized defenses are likely to apply. In a products liability class action suit against a drug manufacturer, for instance, the manufacturer may assert that the drug does not cause the disease at issue and may also argue that many patients knew of the relevant dangers at the time they took the drug. If the individual defense would be a

complete defense, the trial judge surely is not barred from estimating, before he decides the class certification question, how many individuals could be vulnerable to that defense. A procedural mechanism designed to be functional and pragmatic cannot be held hostage by a defendant who merely raises the theoretical possibility that individualized defenses will apply to all plaintiffs.

There is also no legal basis for such a result. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), relied on by the majority, does not stand for the proposition that a court cannot realistically appraise a class complaint to determine whether common questions predominate over individual ones. *Eisen* holds merely that a court cannot conduct a "preliminary hearing" into the merits and conclude that the plaintiff is likely to prevail *on the litigation* as a basis for shifting to the defendant the cost of providing notice to absent class members. *Eisen* thus prevents a district court from requiring defendants to a class action to pay the costs of the litigation before any definitive resolution of the defendants' liability has been made. But surely *Eisen* does not prevent a court from determining how many individuals will be affected by certain defenses in an effort to gauge, not whether the class will prevail, but whether common questions transcend merely individual ones. *See Strong v. Arkansas Blue Cross & Blue Shield, Inc.*, 87 F.R.D. 496 (E.D.Ark. 1980) (holding that, while it is not appropriate to consider the merits in determining certification, the admissibility of all evidence which has relevance to the merits is not barred if it is relevant to the purpose of refuting or supporting the existence of a class); *see also Dura-Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87 (S.D.N.Y. 1981) (if there is no chance at all that a reasonable investor would have been able to discover an alleged fraud, plaintiff need not establish due diligence and due diligence is thus removed as an individual question of fact which could possibly predominate over common questions).

In fact, to the extent there is precedent on this question, it supports the view that inquiry into the actual facts of a case is proper to determine whether common questions predominate. In *General Telephone Company of the Southwest v. Falcon*, 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982), the Court stated that a sufficient indication that an employer used similar means to discriminate in both hiring and promotion decisions would justify a single class action on behalf of both potential hirees and potential promotees. *Id.* at 158, 102 S.Ct. at 2371. As a corollary, when class plaintiffs claim that some of the same decisional bases were used for hiring and promotion decisions, a court will have to evaluate the extent of the overlap to determine whether the common factors are strong enough to justify a single class action on behalf of both hirees and promotees. Similarly, to determine whether plaintiffs have standing to seek injunctive relief for future injuries, courts must assess in real-world terms the likelihood that the plaintiffs will be subjected in the future to the complained-of conduct. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 1667, 75 L.Ed.2d 675 (1983). There is simply nothing forbidden, or unusual, in the need for a court to look into the actual facts of a case in an effort to resolve threshold questions such as whether common questions predominate over individual ones.

Moreover, this circuit has already confronted virtually the identical question regarding commonality presented in this case and resolved it in a way contrary to the majority's disposition today. In *Dellums v. Powell*, 566 F.2d 167 (D.C.Cir.1977), a class of some 2,000 people who had been arrested during an anti-war protest at the Capitol sought damages from, *inter alia*, Chief James Powell of the United States Capitol Police. In opposing class certification, Chief Powell pointed to several record facts which showed that some of the demonstrators had been engaging in unlawful conduct at the time of the arrest—four to five had been climbing lampposts, one or two had been writing on the walls of the Capitol, and a group of around 100 had

disobeyed orders to disperse. After a realistic appraisal of this evidence, we rejected the argument that the *possible* existence of these individualized defenses should preclude class certification. Chief Powell's objections were "largely theoretical," we said, because it was clear that at the time of the lawsuit he "had no means of identifying" any of the individuals who had been allegedly arrested lawfully. *Id.* at 191. *Dellums* thus clearly rejected the majority's position that it is impermissible to pierce theoretical individualized defenses to evaluate the realistic likelihood that at trial they will in practice outweigh the issues common to the class.

Applying these principles to this case, I conclude that the class should have been certified. As to the false arrest claim, it simply blinks reality to think that probable cause could be demonstrated for a significant number of the 8,000 arrests at issue. Appellees deliberately failed at the time to maintain proper arrest records and, as in *Dellums*, have thus virtually foreclosed any opportunity to show that the arresting officer had probable cause to make an arrest in any particular case. Indeed, on remand in *Sullivan v. Murphy*, the companion suit to this case in which expungement of arrest records was sought, the District stated that "an affirmative showing of probable cause [could] not be made in any of the pertinent cases" and therefore a final order was issued by the district court declaring all the arrests invalid. 380 F.Supp. 867, 868 (D.D.C.1974). Similarly, in *Dellums v. Powell*, a damages action arising out of other mass arrests during the May Day period, defendants failed to take discovery from a single absent class member. 566 F.2d at 191. In view of the facts of this case and these prior encounters with the District's mass arrest procedures, it seems quite clear to me that, pragmatically viewed, the dominant if not sole issue at trial on the false arrest claim would be the amount of damages that ought to be awarded to the class or to various sub-classes.

The majority recognizes that bifurcation of trials into liability and damages phases is a well-accepted means for dealing with actions similar to the present one, but then asserts that a very different situation is presented when, as in the false arrest claims, the issue of liability *vel non* turns upon highly individualized facts such as whether probable cause for the arrest existed. I view this purported distinction as highly formalistic, for it makes the viability of a class action depend on whether the very same issue is treated as a defense to the action or as a damage mitigation measure. The emptiness of this distinction is demonstrated by the fact that the complaint also includes conspiracy counts, to which it is no defense to assert that the defendants also had proper motives for their conduct, *see Halberstam v. Welch*, 705 F.2d 472, 477 (D.C.Cir.1983); such an assertion is relevant to a conspiracy charge only at the stage of determining whether any actual damages have been suffered. Thus, under the liability/damages distinction offered by the majority, the false arrest claim could not proceed as a class action while the conspiracy counts could, even though the very same potential individualized defenses would be raised in both. That result makes little sense, especially in the context of a rule designed to be practical.

Without launching into an extended debate with the majority on the substantive law of civil conspiracy, I believe the conspiracy allegations *can* be viewed separately from the underlying tort claims in this action. First, it is not the law of this circuit that a conspiracy claim which arises under *federal* law is sustainable only after an underlying tort claim has been established; the passage to this effect in *Halbertsam v. Welch*, 705 F.2d at 479, cited by the majority, is no more than a statement of the elements necessary to prove a conspiracy under District of Columbia law. Indeed, the court in *Halberstam* made clear that it was not expressing an opinion on whether "the element of combination alone may make certain acts unlawful—even though they would not be so if performed independently by individuals." *Id.*

at 477 n. 7; *see also* W. PROSSER, LAW OF TORTS § 46, at 293 (4th ed. 1971) ("[I]t now seems generally agreed, although there has been authority to the contrary, that there are certain types of conduct ... in which the element of combination adds such a power of coercion ... that it makes unlawful acts which one man alone might legitimately do."). In a case such as this, in which federal and local officials are charged with plotting massive civil rights violations, common sense, sound policy and governing law all suggest that the agreement alone suffices to establish liability. *See Hobson v. Wilson*, 737 F.2d 1 at 52 (D.C.Cir.1984) ("To make the conspiracy actionable, there must also be an overt act in furtherance of the object of the conspiracy that injures plaintiff in his person or property, or, *in a section 1985(3) action, which deprives him of having or exercising any right or privilege of a citizen of the United States.*") (emphasis added). *Hobson* does not suggest that the overt act must itself be tortious. Moreover, to the extent an underlying tort is required, there is nothing to suggest that *each* member of the plaintiff class need prove that he was the specific victim of tortious action—it may suffice that the conspirators undertook some tortious conduct with respect to the class as an entity. That requirement is clearly met in this case. It is unnecessary to resolve these questions about the substantive nature of federal civil conspiracy law, however, in order to convince me that these questions, and the ability of plaintiffs to establish the existence, scope, and nature of any conspiracy among the defendants, are much more central to this litigation than the question whether the defendants can establish probable cause for the otherwise unlawful arrest of some of the plaintiffs.

I would therefore hold that the false arrest, constitutional, and conspiracy claims, all of which have the same basic structure, are appropriate for class treatment.

As to the abuse of process claim, the majority's position is in my mind even less convincing. The majority states that "the problem in the present case is that it is unclear how many putative class members were allegedly victimized by abuses of the judicial process." As an empirical matter, this statement is flawed; the District admits that "almost all plaintiffs were subject to some sort of criminal or juvenile proceedings following their detention, the form of proceeding vary[ing] from forfeiture of collateral to no papering to prosecution." District Brief at 25. More importantly, the majority's position drastically alters the burden of proof for class certification questions.

While the majority correctly notes that some circuits have stated in passing that plaintiffs bear the burden of establishing that the requirements for class treatment have been met, it is equally correct that many courts and commentators have concluded that Rule 23 is directed to the trial court and that Rule 23 determinations are to be made in a nonadversarial context. *See generally* 1 H. NEWBERG, CLASS ACTIONS § 2076 ("Burden of proof concepts ... are not appropriate in dealing with a determination respecting whether [an action brought under Rule 23] should be permitted to be maintained."); *City of Philadelphia v. Emhart Corp.*, 50 F.R.D. 232, 235 (E.D.Pa.1970) (stating that plaintiff has burden of showing he meets Rule 23 but then *sua sponte* dividing the claimed class into subclasses and allowing the class action to proceed). Moreover, even if as a formal matter the plaintiff bears this burden, the very cases cited by the majority make clear that the trial judge cannot, as in this case, passively rest on the pleadings and dismiss an action for failure of the complaint to suggest viable subclasses that would make the action manageable; as the court stated in *Doctor v. Seaboard Coast Line R.R.*, 540 F.2d 699, 707 (4th Cir.1976):

> In determining whether the plaintiff has met his or her burden, the trial court may look to the pleadings "but [t]he determination usually should be predicated on more information than the complaint itself affords." The court may, and often does, permit discovery relating to the

issues involved in maintainability, *and a preliminary evidentiary hearing may be appropriate or essential as a part of the vital management role which the trial judge must exercise in class actions to assure that they are both meaningful and manageable.* (quoting *Huff v. N.D. Cass Co.,* 485 F.2d 710, 713 (5th Cir.1973) (emphasis added).

*See also Dillon v. Bay City Construction Co.,* 512 F.2d 801, 804 (5th Cir.1975) ("Additionally, the plaintiffs were entitled to discovery which would bear on the always troublesome questions of whether this was or ought to be considered a class action ... and the terms and conditions, if any, on which it could proceed.").

With respect to the abuse of process claim, the obvious, and traditional, means of dealing with the majority's concern would be to sub-divide the class into those who were subject to prosecution, those who were subject to forfeiture of collateral, and those subject to no papering, and to award damages accordingly; to collect damages, a plaintiff would have to demonstrate, as always, the class to which he belonged. The solution is not to require the plaintiffs to make this demonstration in their complaint on pain of losing the opportunity to litigate as a class. Contrary to the majority's intimation, *see* Maj.Op. at 1415 n. 10, I am not engaging "in the business of creating classes and subclasses never suggested by the parties;" my contention is simply that the district court's failure to explore the possibility of subclass treatment through an evidentiary hearing and other avenues, such as creating a discovery schedule for both sides on the probable cause issue, constitutes reversible error. I would therefore remand so that the district court, after an evidentiary hearing, would enter findings of fact as to why the class action rule, which is to be given a liberal construction rather than be contracted into nothingness, should not favor class or subclass treatment of this action.

It is of course true, as the majority states, that district judges have significant discretion in determining whether a class action is the most appropriate means of conducting a particular lawsuit. But the extent of that discretion should vary with the nature of the determination which the district judge has made; the less a determination depends on the district judge's familiarity with the facts and the particular case, the less the basis for appellate court deference. For example, in *National Association for Mental Health, Inc. v. Califano,* 717 F.2d 1451, 1459 (D.C.Cir.1983), cited by the majority, it was entirely appropriate for this court to accord substantial deference to a district judge's determination that representation by the class representative had not been adequate; the district judge was uniquely situated to make this determination. In this case the situation is very different. Despite the vintage of this litigation, no proceedings had yet taken place before the district judge that made him any more familiar with the potential complexities of class treatment of this case than an appellate court would be; the district judge decided the certification issue essentially on the bare papers *and without conducting any hearing.* Under these circumstances, the rationales for deferring to the discretion of the district court are significantly attenuated.

More importantly, the fact that a district judge has some discretion in class certification decisions does not mean that those decisions can be made in a way that undercuts the purposes and policies of Rule 23. As other courts of appeals have recognized, "[a]lthough the district court has broad discretion in determining whether a particular action [is suitable for class treatment], the application of these requirements should not be so strictly applied that the policies underlying class action would be undermined." *Weathers v. Peters Realty Corp.,* 499 F.2d 1197 (6th Cir.1974). The failure to certify this class, which the majority approves only by turning its back on the actual circumstances spawning this lawsuit and on the issues that would in practice predominate at trial, sufficiently contravenes the purposes of the "functional" and "pragmatic" approach embodied in Rule 23 that I would overturn the district

judge's refusal to certify the class. I therefore dissent from that part of the majority's opinion that holds otherwise.

### III.

I am also somewhat troubled by the majority's approval of the decision to deny class certification on the grounds that the motion to certify was untimely. I would require, as have most other courts and as has been advocated by eminent commentators, that a class certification motion not be denied on timeliness grounds unless the defendants can make some showing that they have actually been prejudiced by the delay. *See Senter v. General Motors Corp.*, 532 F.2d 511, 521 (6th Cir.), *cert. denied*, 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed.2d 150 (1976); *see also Larionoff v. United States*, 533 F.2d 1167, 1183 (D.C. Cir.1976) ("absent some showing of actual prejudice either to the Government or to the absent class members, we cannot conclude that the simultaneous entry of the judgment and the class action certification was reversible error."); *see generally* 7A C. Wright & A. Miller, Federal Practice and Procedure § 1785 (1972 & 1982 Supp.). Whether such a showing could be made in this case is unclear; no discovery was taken of the original thirty-nine plaintiffs before the class certification motion was filed and hence it would be somewhat anamalous for the defendants to assert that the delay in moving for certification undermined their discovery efforts. I see no reason to elaborate my views on this question at length, however, for in light of the adoption of Local Rule 1–13(b) in 1973, few if any cases will be affected by the majority's timeliness discussion. I therefore merely note my reservation on this question.