Paul D. HARRINGTON, Luba Val Harrington, Sally A. Cumming, Brendan Jacob, Innocent Emmanuel, Plaintiffs,

v.

**UNITED STATES of America, Defendant.**

Civ. No. 85–2347CCC.

United States District Court, D. Puerto Rico.

Oct. 19, 1990.

---

José E. Fernández–Seín, Nachman & Fernandez–Seín, Santurce, P.R., for plaintiffs.

Daniel F. López–Romo, U.S. Atty., Fidel Sevillano, Asst. U.S. Atty., Hato Rey, P.R., and Joseph F. Ahern and Thomas J. Donlan, Torts Branch, Civil Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

## OPINION AND ORDER

CEREZO, District Judge.

This cause was heard before the Court without a jury. After due consideration of the extensive evidence submitted, the Court hereby makes the following findings of facts and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

### FINDINGS OF FACTS

1. Plaintiffs are: Brendan Jacob, a naturalized citizen of Australia; Paul Harrington, a British citizen; Luba Val Harrington, a naturalized citizen of Australia; Sally Ann Cumming, an Australian citizen, and Innocent Emmanuel, a citizen of St. Lucia.[1] The sole defendant is the United States of America.

2. On August 1983, all plaintiffs, except for Innocent Emmanuel, began a two year trip around the world on an 1897 sailing clipper known as the ESPERANCE, with a length of 65 feet and a weight of 155 tons.

3. The ESPERANCE was bought by Mr. Harrington and Mr. Jacob in August 1983, just shortly before the beginning of the trip. It was registered with the Hutt River Province of Western Australia, as they were not eligible for Australian registration. However, during the course of the trip, they flew both the Australian flag and the Hutt River Province flag.

4. By April of 1984, the ESPERANCE's worldwide trip had brought them to the Caribbean island of St. Lucia, after departing from Antwerp, Belgium, and having made stops at England, Spain, Portugal, Morocco, Barbados, Tobago and Grenada.

5. On June 13, 1984, while the ESPERANCE was docked at St. Lucia, a man named Roger Wood contacted plaintiffs to see if they would enter into a charter agreement with him. The purpose of the charter agreement was to help a vessel in distress known as the STECARIKA, a 317 feet long, approximately 3,000 ton freight ship, which was adrift at sea experiencing engine problems. Plaintiffs were to provide mechanical help as well as food, as supplies were running low.

6. Plaintiffs accepted the charter, which they expected would take five (5) days. Mr. Wood agreed to pay all the expenses, at a rate of $400 per day. He made an advance payment of $1,000.00.

7. On June 14, 1984, Mr. and Mrs. Harrington, Mr. Jacobs, Mrs. Cumming, two residents of St. Lucia: Mr. Emmanuel and Mr. Blaise Felix, together with Mr. Wood, left to make contact with the STECARIKA. While they were on their way, they were overflown three times by a U.S. Coast Guard jet. They finally arrived at the area where the STECARIKA was located on June 18, 1985, at around 3:00 A.M.

8. At around 8:00 A.M., a line was attached from the stern of the STECARIKA to the stern of the ESPERANCE to allow both vessels to drift at the same speed. Afterward, Paul Harrington, Blaise Felix and Roger Wood went over to the STECARIKA with a portable generator, some fuel and spare parts in an attempt to fix its mechanical problems. A portable pump and a hose were later transported.

---

1. Although a seventh plaintiff, Blaise Felix, was originally a part of this suit; plaintiffs' counsel moved in open court for the dismissal of his claim because of his unavailability to testify at trial. Accordingly, the Court, by separate order, has entered partial judgment dismissing his claim.

9. Meanwhile, the U.S. Coast Guard cutter DALLAS was cruising the Caribbean on a law enforcement patrol. Late on the eighth (8) of June or early on the ninth (9), its captain received a message from the El Paso Intelligence Center to the effect that intelligence sources had reported a British flag vessel named STECARIKA as having departed Santa Marta, Colombia, on June 5, 1984 with fifty thousand (50,000) pounds of marijuana hidden in its lower deck. According to the same sources, the vessel was expected to pass into the Atlantic Ocean to an off-load site between Great Inagua Island and Cuba. (*See* Defendant's Exhibit P).

10. While the DALLAS was on its way to meet the STECARIKA, it received two other messages with intelligence information indicating that the STECARIKA had been sighted near a sailing vessel, and that both vessels were en route to a rendezvous south of the Mona Pass to unload an unknown type and quantity of contraband. (*See* Defendant's Exhibits A, B; Plaintiffs' Exhibit 12, pp. 17–65, 17–66).

11. On June 18, 1984, at approximately 10:00 A.M., the DALLAS first sighted both the STECARIKA and the ESPERANCE. The DALLAS crew observed that a rope was extended from the back of the freight vessel to the back of the sailing vessel. Additionally, it was noticed that the ESPERANCE was not flying any registration flag.

12. Radio communication between the DALLAS and the STECARIKA was attempted to no avail. Brendan Jacob then initiated radio contact with the DALLAS from the ESPERANCE and requested assistance on behalf of the STECARIKA. The DALLAS proceeded to ask Mr. Jacob certain standard questions, among them what was the nationality of the vessel and the home port of the vessel. Mr. Jacob responded that the home port of the vessel was Brisbane, Australia; and that the ESPERANCE was registered in the Hutt River Province. The DALLAS captain, however, misunderstood the term Province as meaning Providence, an Australian city,

and interpreted it as a claim of Australian registration.

13. Around noon that same date, Blaise Felix hoisted the Australian flag as the registration flag. The Hutt River Province flag was never raised during this entire incident.

14. The DALLAS, through the ESPERANCE, requested permission to send a boarding party over to the STECARIKA. The master of the STECARIKA consented to the boarding of his vessel. A boarding party then proceeded to board the ship. They detained the crew of the STECARIKA at the stern of the ship, while they searched it. Among those detained were ESPERANCE crew members Mr. Felix, Mr. Wood, and plaintiff Mr. Harrington. However, after several hours, they decided to return to the ESPERANCE. Although they were initially denied permission to leave by a Coast Guard officer on board the STECARIKA, they proceeded to abandon the ship. They were told then that their request for permission to leave was granted.

15. Mr. Harrington admitted that he was never assaulted by anyone while aboard the STECARIKA, nor at any moment after June 13, 1984.

16. On June 18, 1984, several hours after the ESPERANCE crew members left the STECARIKA, that ship was seized by the Coast Guard and its crew arrested after marijuana was found on board. It was later determined by Customs officials that the STECARIKA was carrying twenty-two thousand (22,000) pounds of marijuana.

17. The Coast Guard requested permission to board and search the ESPERANCE on June 18, 1984, but such permission was denied. It was then decided to initiate all appropriate procedures to obtain from the Coast Guard Commandant a statement of no objection to board and search the ESPERANCE as a stateless vessel. A statement of no objection, as its name suggests, is issued by the Commandant only when he does not object to a particular proposed course of action to be taken by a commanding officer on the scene. Before its issuance, a process of consultation between

several federal agencies is conducted in Washington in order to prevent that the course of action taken could later culminate in incidents affecting the foreign relations of the United States. This process of consultation is conducted pursuant to the requirements established in the Presidential Directive 27. In this particular instance, the process of consultation concluded with a determination that the ESPERANCE could be boarded and searched as a stateless vessel since its claim of Australian registry was checked with the Australian government, and it had refuted registration. Apart from this condition, there are two other situations under which a vessel can be considered as a stateless vessel: when it makes conflicting claims of registry (registration in more than one country is alleged), or when it fails to make any claim of registry or is in fact not registered with any sovereign state.

18. On the evening of June 18, plaintiffs Brendan Jacob and Paul Harrington went over to the STECARIKA to claim their electric generator and to determine what was the status of the ship. They were not allowed to board the vessel as they were told it had been seized. Upon returning to the ESPERANCE, they radioed the DALLAS in an attempt to obtain additional information about the STECARIKA, and to inquire whether they were detained for the night. They did not receive a response, and were asked instead to "stand by."

19. A statement of no objection to board and search the ESPERANCE was received by the DALLAS at 10:13 P.M. on the evening of June 18, 1984. Boarding was not conducted at that time, however, as the DALLAS crew was engaged in the transfer of prisoners from the STECARIKA to the DALLAS. Had plaintiffs attempted to leave after that time, they could have been stopped, boarded and searched by the Coast Guard. The following morning, at around 7:15 A.M., an armed Coast Guard party finally proceeded to board the ESPERANCE. Upon boarding, plaintiffs repeated their claim of Hutt River Province registry. The registration papers were duly checked, and confirmed their claim of registry. However, the Australian flag remained hoisted.

20. Plaintiffs also explained to the boarding party that they were chartered by Mr. Roger Wood in St. Lucia to render assistance to the STECARIKA and its crew. In fact, while the search was being conducted, the Coast Guard received several pieces of information which indicated that Mr. Wood was closely connected with the STECARIKA. His British passport showed that his full name was Roger Williams Early Wood, born on July 21, 1944, which coincided with the name and date of birth of the captain of the STECARIKA, as stated in a previous intelligence report received by the DALLAS (Exhibit B). In addition, the custody crew on board the STECARIKA reported finding pictures of Mr. Wood and pieces of paper containing his name in the master's cabin of that vessel. Moreover, the DALLAS request for any information about him maintained by E.P.I.C. revealed that he was the master of a vessel named STEZARRIA, closely resembling the spelling of STECARIKA (see Exhibit H). Finally, the Coast Guard party on board the ESPERANCE was informed by Mr. Harrington about the constant radio communications established by Mr. Wood with the STECARIKA, which were conducted in code.

21. The boarding party remained on board the ESPERANCE for approximately twelve (12) hours. They were allowed by plaintiffs to search all areas of the vessel. The boarding party even drilled on some areas in which soft cement was found. No contraband was detected aboard the sailing vessel.

22. Except for an initial incident of hostility, plaintiffs were very cooperative with the members of the boarding party during the time they remained on board the ESPERANCE. Similarly, the boarding party was friendly toward the ESPERANCE crew. Although the crew was asked to remain on the ESPERANCE bridge while the search was conducted, the boarding party allowed them to go below to use the toilet and kitchen facilities without being stopped or hindered.

23. Once the search concluded, plaintiffs asked the Coast Guard to provide them with fuel for their return trip to St. Lucia. The Coast Guard suggested a tow to San Juan, Puerto Rico, instead, and plaintiffs accepted. The tow of both the STECARIKA and the ESPERANCE by the DALLAS began on the early evening of June 18, at 8:05 P.M.

24. Upon completion of the boarding and search of the ESPERANCE, Mr. Gary F. Crosby, captain of the DALLAS, decided that he would seize the vessel and arrest its crew. Among the facts and circumstances taken into account by Captain Crosby in determining whether there was probable cause to arrest were: the fact that the ESPERANCE had a line attached to the STECARIKA when the DALLAS first arrived at the scene, indicative of an unload operation; the fact that three crew members of the ESPERANCE were on board the STECARIKA; previous intelligence information received stating that the STECARIKA was loaded with marijuana, and that there was going to be a rendezvous with it; the relationship between the masters of the ESPERANCE and Mr. Wood, whom intelligence sources indicated was the probable master of the STECARIKA; the fact that the ESPERANCE did not appear to be able to conduct a salvage operation on a vessel the size of the STECARIKA; and the conflicting claims of registry of the sailing vessel ESPERANCE.

25. Mr. Crosby received a statement of no objection to seize the ESPERANCE on June 19, 1990, at around 10:20 to 10:45 P.M. (Exhibit S). He decided not to seize the vessel and arrest the crew immediately, however, to avoid having to stop the tow which was already en route to San Juan amid the then prevailing adverse weather conditions. At the time the statement of no objection to arrest and seize was received aboard the DALLAS, they were located outside the territorial waters of the United States.

26. All plaintiffs were finally arrested the following day, June 20, 1984, at around 7:21 P.M., more than twenty (20) hours after the statement of no objection to arrest and seize was initially received. By that time, the weather conditions had already improved. When the arrest took place, they were still located outside the territorial waters of the United States.

27. To effectuate the arrest, a party of Coast Guard officers again boarded the ESPERANCE and announced plaintiffs that their vessel was seized and that they were under arrest. The party then proceeded to transfer the plaintiffs to the DALLAS, and advised them to take only one change of clothing. While they were being transferred to the DALLAS on a Coast Guard dinghy, their clothes got wet due to conditions at sea.

28. Upon arriving at the DALLAS, all plaintiffs were subjected to a pat-down search. They were handcuffed around their ankles with a plastic wire tag, which in turn was secured to a rope attached to the deck and which extended for the full length of the ship. They were given air mattresses to rest, blankets, and were allowed to sit together and to speak to each other. They were also examined by a medical doctor.

29. Plaintiffs Luba Harrington and Sally Ann Cumming, feeling uncomfortable with their wet clothes, removed the same as soon as they reached the DALLAS and requested that they be dried. The Coast Guard officers refused. They remained in their underwear, covered only with blankets. Later, however, while Mrs. Harrington was standing trying to blow the air mattress previously given to her, her blanket fell off and she was seen wearing only her underwear by some male crew members of the DALLAS and the detained crew members of the STECARIKA. After this incident, the crew of the DALLAS took their wet clothes and dried them up.

30. Initially, the only toilet facility with which plaintiffs were provided aboard the DALLAS was a plastic bucket located on the back of the ship's open deck. There were no curtains around it, and neither toilet paper nor hand-washing facilities were provided. Although plaintiffs at first refused to utilize the same, eventually Sal-

ly Ann Cumming, beset with a medical condition that required her to urinate frequently, requested to make use of it. She was then escorted to the bucket by a male Coast Guard officer. Once there, she requested permission to move the bucket so as to avoid being observed by the detained crew members of the STECARIKA and other Coast Guard officers. She also asked the officer that was escorting her if he could turn his back while she used the bucket. Both requests were granted. Later that night, the female plaintiffs were permitted the use of the toilet facilities located at the ship's doctors quarters. The following morning, this privilege was extended also to the male plaintiffs.

31. The DALLAS finally arrived at San Juan on June 21, 1990 at 7:26 P.M. At around 8:10 P.M., the plaintiffs began to leave the DALLAS. Once on shore, they were again handcuffed and body searched. Afterwards, they were transported in a van to the U.S. Customs Building located in Old San Juan. Upon arrival there, they were placed in a holding cell and interviewed by different Customs officers. Later they were transferred to a conference room, where more interviews were conducted. After the interviews were concluded, all plaintiffs were photographed and fingerprinted.

32. In the early morning hours of June 22, a U.S. Magistrate came to the Customs Building and notified plaintiffs that they were being detained on a charge of conspiracy to smuggle contraband to the United States. Bail was set at $20,000.00 for each one of them. The magistrate advised plaintiffs of their right to be assisted by counsel, and further informed them that one would be appointed by the Court if they were unable to afford it. He also asked plaintiffs if they wanted to make a phone call. They expressed their intentions of calling the Australian government. The Magistrate then instructed the Customs officers present in the room to allow plaintiffs to contact the Australian embassy. Mr. Harrington was allowed to make a phone call on behalf of all plaintiffs, but upon noticing that there was no embassy located in Puerto Rico he expressed his desire to phone the Australian Embassy in Washington, D.C. He was not allowed to make that call.

33. Later that morning, the male plaintiffs were transported to the Rio Piedras State Penitentiary and the female plaintiffs to the Vega Alta Women Prison. Upon arriving at the prison, Mr. Harrison, Mr. Jacobs and Mr. Emmanuel were searched by the guards. Mr. Harrington was searched twice. Afterwards, they were placed in a holding cell, where they remained until the afternoon when cells were assigned to them. Once assigned to their cells, they were only allowed to leave the same when taken to eat their meals and to shower. They remained in prison for one full week, as they were finally released on the afternoon of June 29, 1984. The order dismissing the charges brought against them was in fact signed the day before, but their release was delayed for a day while they waited for the Immigration and Naturalization Service to issue them parole visas. During their stay in prison, Mr. Jacobs was twice allowed to make phone calls not exceeding three (3) minutes.

34. Mrs. Harrington and Mrs. Cumming, on the other hand, were strip searched upon arriving at the prison. They were then assigned prison clothes, and taken to their cells. Although they were occasionally allowed to leave the cell for recreational purposes, they were frisked every time they were returned to their cells. In only one occasion during their week of confinement were they allowed to leave the prison, and this to be transferred to the office of the U.S. Marshals located in Old San Juan. Upon returning to the prison, they were once again strip searched. During their stay, Mrs. Cumming was allowed to place one phone call to her parents. They were released from prison during the morning of June 29, 1984, just hours before their male companions, as their release was delayed for similar reasons.

35. Once released from prison, all plaintiffs were transported back to the U.S. Customs Building, where they were returned several items that had been removed from the ESPERANCE. They were

then taken to Pier 15 on San Juan Harbor, where the ESPERANCE had been moored since its arrival in San Juan a week before.

## CONCLUSIONS OF LAW

### I. *Subject matter jurisdiction*

It is axiomatic that Congressional waiver of sovereign immunity is a prerequisite to any suit brought against the United States. Recognizing this fact, plaintiffs filed their complaint under the provisions of the Federal Tort Claims Act (F.T.C.A.), 28 U.S.C. §§ 2671–2680, which they considered the applicable expression of governmental consent to be sued. At the close of plaintiffs' evidence, however, the United States moved for dismissal under Rule 12(h) of the Federal Rules of Civil Procedure of claims numbered 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 27, 28, 29 and 30, all of which were brought against various Coast Guard officers for their alleged commission of several torts against plaintiffs (*see* complaint, ¶ 131–162, pp. 23–28). The government argued that these claims were cognizable solely under one specific federal admiralty statute, the Public Vessels Act (P.V.A.), 46 U.S.C. §§ 781–90; and that plaintiffs failure to comply with the provisions of that statute deprived the Court of jurisdiction to adjudicate the merits of the same. We declined to decide the matter at that time, and instead granted both parties additional time to submit legal memoranda in support of their respective positions. Defendant having complied,[2] we now address the issue.

■ At the outset, we recognize that even though the F.T.C.A. is the statute which usually acts as the waiver of sovereign immunity for tort actions brought against the government, its provisions are generally inapplicable when an admiralty claim exists (*see* 28 U.S.C. § 2680(d)). In those instances, instead, tort actions against the government are usually required to be brought under any of two other statutes by which Congress has similarly renounced the government's immunity from suit: the Suits in Admiralty Act (S.I.A.A.), 46 U.S.C. §§ 741–52, and the P.V.A. A determination on whether the claims challenged in this action were correctly brought under the F.T.C.A., or whether they had to be asserted instead under either the P.V.A. or the S.I.A.A., depends initially on whether admiralty jurisdiction exists over the torts there described.

■ In order for a tort claim to be considered maritime in nature, two requirements must be satisfied. First, the "wrong and injury complained of must have been committed wholly upon the high seas or navigable waters." *Executive Jet Aviation, Inc. v. City of Cleveland,* 409 U.S. 249, 253, 93 S.Ct. 493, 497, 34 L.Ed.2d 454 (1972) (quoting *The Plymouth,* 70 U.S. (3 Wall.) 20, 35, 18 L.Ed. 125 (1866). Second, the wrong must "bear a significant relationship to traditional maritime activity." *Executive Jet Aviation,* 409 U.S. at 268, 93 S.Ct. at 504; *Foremost Insurance Co. v. Richardson,* 457 U.S. 668, 673–74, 102 S.Ct. 2654, 2658, 73 L.Ed.2d 300 (1982). What exactly is meant by this last phrase remains to be "clearly defined" by the Court. *Shea v. Rev–Lyn Contracting Co., Inc.,* 868 F.2d 515, 517 (1st Cir.1989). However, the circuit courts have suggested that several factors be taken into consideration when applying this prong of the test. Among them are: 1) the functions and roles of the parties, 2) the types of vehicles and instrumentalities involved, 3) the causation and type of injury and 4) traditional

---

**2.** The court originally granted the parties until July 20, 1989 to file their legal memoranda. However, plaintiffs later requested an extension of time to submit the same (docket entry 56), arguing that in order to prepare their opposition to the government's motion to dismiss they were required to examine the transcripts of the testimony of two of the witnesses that testified at the trial, Captain Gary Crosby and Commander Richard White. Plaintiffs specifically requested from the Court to allow the filing of their an-

nounced opposition within a period of two weeks after the submission of the said transcripts. The Court granted their request. On a later motion, plaintiffs informed the Court that they had received the copies of the said transcripts on September 13, 1989, and requested until September 29, 1989 to file their brief (docket entry 59). The Court once again granted their motion. Notwithstanding the additional extensions of time provided, however, plaintiffs' memorandum was never filed.

concepts of the role of admiralty law. *Id.,* at 517. *See also Drake v. Raymark Industries, Inc.,* 772 F.2d 1007 (1st Cir.1985). It has been recently decided that under this last factor the courts should also consider "1) the impact of the event on maritime shipping and commerce, 2) the desirability of a uniform national rule to apply to such matters and 3) the need for admiralty 'expertise' in the trial and decision of the case." *Molett v. Penrod Drilling Co.,* 826 F.2d 1419, 1426 (5th Cir.1987); *Shea,* 868 F.2d at 518.

■ Having stated the applicable law, we now turn our attention to the claims over which jurisdiction is contested to determine whether the tortious acts there described do classify as maritime torts. In doing so, we note that except for claim number thirty (30), all the challenged claims describe tortious acts committed by Coast Guard officers, either intentionally or negligently, while plaintiffs were in the navigable waters of the Caribbean Sea on board their sailing vessel ESPERANCE, the freighter STECARIKA, or the Coast Guard ship DALLAS. That being the case, it is evident that the first requirement of the *Executive Jet* test is clearly established.

With regard to the second prong of the test, an analysis of its different factors leads us to conclude that it is also met. First, in considering the functions and roles of the parties, we note that at the time the incidents took place plaintiffs were primarily engaged in salvage activities, a traditional maritime concern. The Coast Guard officers, on the other hand, were applying the customs laws of the United States pursuant to their law enforcement capacity, which since ancient times have been an important maritime activity.[3] Secondly, in considering the types of vehicles and instrumentalities involved, we initially note that the torts were allegedly produced by individual persons, and not by any vessels or instruments there located. However, inasmuch as the tortfeasors acted in their capacity as crew members of a ship, they are considered for purposes of this factor as constituting an extension of the same.

In discussing the next factor, the causation and type of injury, recognition must be made of the fact that all the torts alleged could have taken place on land as well as at sea. Nonetheless, the fact remains that plaintiffs where injured while on the high seas, and that under such circumstances torts have traditionally been cognizable in admiralty. *See e.g. Colavito v. Gonzales,* 1983 A.M.C. 1378 (S.D.Tex.1981) (assault and battery), *Castillo v. Argonaut Training Agency,* 156 F.Supp. 398 (S.D.N.Y. 1957) (false imprisonment). Finally, we must examine whether the traditional concepts of the role of admiralty law are met by our assertion of admiralty jurisdiction over these tort claims. In that regard, it should be undisputed that the occurrence of the incidents, as described in the challenged claims, can certainly cause an impact on maritime shipping and commerce, as they imply that the Coast Guard has exceeded its discretion when acting in its law enforcement capacity, which is supposed to guarantee the flow of all legal shipping and licit commerce. Nonetheless, we fail to see the desirability of a "uniform national rule" to apply to those matters. Neither do we think that these particular tort claims require any kind of specialized admiralty expertise in order to try and decide the same.

When taking into account all the factors described above, and weighing them accordingly, we must conclude that the torts stated in claims number 1, 2, 3, 4, 5, 6, 7, 8,

---

**3.** *See, e.g.* The Articles of Inquisition, adopted at Quinnborow in the year 1376; where it was established as an offense cognizable in admiralty "... Traytor's goods retained in ships and concealed from the King." *Benedict on Admiralty,* § 31 (7th ed. rev.1990). Regarding the consideration of law enforcement activities as a maritime activity, examine Governor Ballamont's commission to suppress piracy. *Benedict on Admiralty,* § 66 (7th ed. rev.1990). *See* *also* generally *Kelly v. United States,* 531 F.2d 1144 (2d Cir.1976) (In referring to the Coast Guard stated that "(i)t would be impossible to find an agency of our government with a closer relationship to maritime activity."). *Accord, Sawczyk v. United States Coast Guard,* 499 F.Supp. 1034, 1038 (W.D.N.Y.1980) (holding that Coast Guard's duty to enforce its jurisdiction and its safety regulations is closely related to traditional maritime activity).

9, 10, 27, 28 & 29 of the complaint bear a significant relationship to traditional maritime activity. As they also took place over navigable waters, they clearly classify as maritime torts under the *Executive Jet* test and, as such, are cognizable only under the admiralty jurisdiction of the Court. That being the case, we now consider whether the F.T.C.A. does not serves as an adequate waiver of sovereign immunity to permit us to entertain those claims, requiring instead that any assertion of jurisdiction over them be made either under the S.I. A.A. or the P.V.A.

■ The determination of whether any of these two acts is applicable, therefore conferring the appropriate waiver of sovereign immunity for the torts here alleged, need not detain us long. Having carefully examined the jurisdictional provisions of both statutes, we agree with the government that the claims now challenged should have been brought under the P.V.A., as it expressly provides for the filing of claims in admiralty against the United States for damages caused by a public vessel of the United States. *See* 46 U.S.C. § 781; *United States v. United Continental Tuna, Corp*, 425 U.S. 164, 96 S.Ct. 1319, 47 L.Ed.2d 653 (1976). As we have just concluded, the challenged claims are cognizable only under the admiralty jurisdiction of the Court. In addition, the Coast Guard vessel DALLAS is clearly a "public vessel" of the United States covered by the provisions of this Act. *Pascua v. Astrocielo Neptunea Armandora, S.A.,* 614 F.Supp. 984, 985 (S.D.Tex.1985); *Helgesen v. U.S.,* 275 F.Supp. 789 (D.N.Y. 1966). The fact that the alleged tortious acts resulting in damages were caused by the crew of the DALLAS, and not by the vessel itself, does not defeat the applicability of the statute. *See Geertson v. U.S.,* 223 F.2d 68 (3rd Cir.1955), *Pascua v. Astrocielo Neptunea Armandora, S.A., supra., Motors Ins. Co. v. U.S.,* 239 F.Supp. 121 (S.D.N.Y.1965), *Page v. U.S.,* 105 F.Supp. 99 (E.D.La.1952), *Woodbury v. U.S.,* 75 F.Supp. 829 (D.Mass.1948), *The Roah Hook,* 64 F.Supp. 288 (E.D.N.Y.1945).

■ We note, however, that section 5 (46 U.S.C. § 785) of the P.V.A. expressly bars suit by foreign nationals, unless it appears to the satisfaction of the Court that their government allows United States nationals to sue in its courts under similar circumstances. *Blanco v. United States,* 775 F.2d 53 (2d Cir.1985). As all plaintiffs were foreign nationals, they were then obliged to comply with this provision of the statute. However, not a single piece of evidence was presented at trial in order to demonstrate that the required reciprocity existed. Under those conditions, the P.V.A. does not properly act as a waiver of sovereign immunity allowing this Court to entertain their claims. Accordingly, as the claims numbered 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 27, 28 & 29 were all based on the alleged maritime torts committed by the Coast Guard officers while they were on the high seas, we are compelled to DISMISS them for lack of subject matter jurisdiction.

In their motion for non-suit filed after plaintiffs' evidence, the Government also moved the Court to dismiss claim number 26, which was brought against officials of the United States Department of State for their alleged negligent determination that the ESPERANCE was a stateless vessel. Although the government similarly avers that the F.T.C.A. does not act as the appropriate waiver of sovereign immunity for this claim either, their position is now based on the belief that one of the exceptions to the waiver of immunity embodied in that statute, generally known as the "discretionary function exception," applies to those claims. As our jurisdiction is once again challenged, we address the matter.

Although it is generally recognized that the United States broadly waived its sovereign immunity from suit in the F.T.C.A., still the statute contains fourteen exceptions to the general waiver of immunity. *See* 28 U.S.C. § 2680. The exception now relevant provides that the government shall not be liable for:

Any claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an

employee of the Government, whether or not the discretion involved be abused. 28 U.S.C. § 2680.

■ As the Supreme Court has aptly described, this exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *United States v. Varig Airlines*, 467 U.S. 797, 808, 104 S.Ct. 2755, 2761, 81 L.Ed.2d 660 (1984). What conduct can be properly classified under the scope of the exception has been the subject of considerable controversy. The Court itself has recognized that "it is ... indeed impossible to define with precision every contour of the discretionary function exception." *Varig Airlines*, 467 U.S. at 813, 104 S.Ct. at 2764. It has, nonetheless, developed general guidelines in an attempt to clarify its extent for a proper application of the same. According to the Court, "it is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case." *Varig Airlines*, 467 U.S. at 813, 104 S.Ct. at 2764. Following this reasoning, a two-prong test has been established for determining whether the exception applies. "(A) court must first consider whether the action is a matter of choice for the acting employee." *Berkovitz by Berkovitz v. U.S.*, 486 U.S. 531, 536, 108 S.Ct. 1954, 1958, 100 L.Ed.2d 531 (1988). "(I)f the employees's conduct cannot appropriately be the product of judgment or choice, then there is no discretion in the conduct for the discretionary exception to protect. *Id.*, at 536, 108 S.Ct. at 1958. Even when there is room for judgment, the Court must then determine if that judgment "is of the kind that the discretionary function exception was designed to shield. The basis for the discretionary function exception was Congress' desire to 'prevent judicial "second guessing" of legislative and administrative decisions grounded in social, economic and political policy through the medium of an action in tort.'" *Id.* at 536–37, 108 S.Ct. at 1959 (quoting *Varig Airlines*, 467 U.S. at 814, 104 S.Ct. at 2764). In sum, the discretionary function exception "applies only to conduct that involves the permissible exercise of policy judgment." *Berkovitz*, 486 U.S. at 539, 108 S.Ct. at 1960.

■ In applying these principles to the case at bar, we first consider whether the decision made by officials of the U.S. Department of State to treat the ESPERANCE as a stateless vessel was precisely the type of conduct intended to be protected by the exception. Having carefully reviewed all the evidence pertinent to this matter, we conclude that it does not. Initially, we note that the Government has basically rested its allegation in that regard on the fact that, to their understanding, the PD 27 procedure followed to reach the determination of statelessness was a policy process. That may well be true, but as we have seen it is not enough to activate the protective shield of the exception under the *Berkovitz* test. Pursuant to its first prong, the application of the discretionary function exception to the claim that the determination of statelessness was incorrect also hinges on whether the agency officials making that determination *permissibly* exercised policy choices. However, as shown conclusively by the evidence, it was precisely this permissibility that the acting State Department officials were lacking, as they were not allowed to make a determination of statelessness based only on their discretion. Quite to the contrary, to reach such a determination they were specifically required by long-established policy considerations to conclude that the suspect vessel clearly classified under any one of these three categories: 1) a vessel declaring no state of registry and flying no flag, 2) a vessel claiming more than one state as its state of registry or 3) a vessel claiming a particular state of registry and the claim being later refuted by that same state. As "the discretionary function exception will not apply when a federal ... policy *specifically* prescribes a course of action for an employee to follow," *Berkovitz*, 486 U.S. at 536, 108 S.Ct. at 1958 (emphasis ours), it is inapplicable where a determination of statelessness by officials of the Department of State is chal-

lenged in court. Accordingly, claim numbered 26 is outside the realm of the exception, and we can properly exercise jurisdiction over it. Therefore, defendant's motion requesting the dismissal of this claim for lack of subject matter jurisdiction is hereby DENIED.

■ In their post-trial brief (docket entry 54), however, the government once again invokes the protection of the discretionary function exception; this time alleging that it renders the Court without jurisdiction to entertain claim numbered 22. In it, plaintiffs allege that they were the "victims of abuse of process when they were detained in prison an extra day on the ground that parole visas had not been prepared by the U.S. Department of Immigration." *See* complaint, ¶ 191, p. 34. The government claims that pursuant to the applicable regulations, the authority to grant parole visas rests solely within the discretion of the district director of the Immigration and Naturalization Service (I.N.S.). That being the case, it avers that the exception is clearly applicable, and that "(t)he court has no jurisdiction to second guess the decision of I.N.S. to release plaintiffs twenty-four hours after the charges were dismissed."

We again turn to the *Berkovitz* test in order to decide this issue. In doing so, we note that its first prong is easily met by this situation, as it is undisputed that the action here challenged, the issuance of a parole visa to plaintiffs to remain temporarily on U.S. soil, was clearly a matter of choice for the district director of the I.N.S. We acknowledge that the applicable regulations, 8 C.F.R. 212.5(a) & (b), did suggest general considerations that could be taken into account when making that decision, but they were far from "specifically prescrib[ing] a course of action for an employee to follow." *Berkovitz*, 486 U.S. at 536, 108 S.Ct. at 1958. We are convinced that the I.N.S. district director's conduct in this regard was discretionary.

Moreover, it seems evident to us that a decision on whether to grant parole visas for normally excludable aliens to remain in U.S. territory precisely involves the kinds of policy contemplated by Congress when creating the discretionary function exception. Unquestionably, all matters related to the determination of when, how and under what conditions foreign nationals are to be allowed to remain within our borders clearly involve both social and political policy. As we find that in delaying the issuance of the parole visas to plaintiffs the I.N.S. district director did nothing more than exercise his policy based discretion, the Court is precluded from second-guessing that determination. We, therefore, agree with the government that the discretionary function exception immunizes the government from liability on this claim and, accordingly, now DISMISS claim numbered 22 for lack of subject matter jurisdiction.

■ A final matter related to the issue of subject matter jurisdiction remains before the Court. After the close of plaintiffs' case, their counsel moved for reconsideration of our previous order and partial judgment entered on September 15, 1987 (docket entries 22 & 23), which similarly dismissed claims numbered 23, 24 and 25 for lack of jurisdiction. In that occasion, we held that yet another exception to the F.T.C.A. general waiver of sovereign immunity, the customs detention exception, 28 U.S.C. § 2680(c), barred the claims brought against the government for the loss of property and damages suffered by the ESPERANCE while it remained detained in San Juan Harbor under the custody of the U.S. Customs Service. Plaintiffs argued orally at trial, in support of their petition for reconsideration, that insofar as the Customs officers were the ones entrusted with the custody of the sailing vessel while it remained docked on San Juan Bay, they were the only ones that could be held responsible for plaintiffs' destroyed or missing property. But, as we explained in our prior order, that is precisely the reason why the mentioned exception is applicable in this case. *See Kosak v. United States,* 465 U.S. 848, 104 S.Ct. 1519, 79 L.Ed.2d 860 (1984). Finding it unnecessary to again dwell with this matter at length, we limit ourselves to refer plaintiffs once again to our previous order, DENY their petition

for reconsideration of the same, and reaffirm our conclusion that claims numbered 23, 24 and 25 are barred by the customs detention exception.

## II. *The merits*

■ Having disposed of all the jurisdictional challenges raised by defendant, the remaining claims are all considered on the merits. As actions brought under the F.T.C.A. are governed by the law of the place where the act or omission causing the injury occurred, *see* 28 U.S.C. § 1346(b); *Massachusetts Bonding & Insurance Co. v. United States*, 352 U.S. 128, 77 S.Ct. 186, 1 L.Ed.2d 189 (1956), we examine the validity of these claims under the applicable Puerto Rico law.

We begin by considering claim numbered 11. In it, plaintiffs allege that they "sustained numerous batteries and assaults" from officers of the D.E.A., the U.S. Marshal's Service, and U.S. Customs when they were arrested after leaving the DALLAS upon their arrival to San Juan (*see* complaint, ¶ 164, p. 28). The Court has previously found that plaintiffs were in fact handcuffed and searched by federal law enforcement officers as soon as they left the DALLAS. We must determine whether these acts do constitute tortious conduct under the law.

Claims of assault and battery are actionable under Puerto Rico law. Civil Code of Puerto Rico, Art. 1802 (31 L.P.R.A. § 5141); *Zalduondo v. Sánchez*, 15 D.P.R. 231 (1909); H. Brau del Toro, *Los Daños y Perjuicios Extracontractuales en Puerto Rico*, §§ 4.03, 4.04 (1986). It has been generally recognized that an arrest, whether with or without a warrant, usually involves conduct which, unless privileged, constitutes assault or battery. As a result, it is now accepted that if a privilege to arrest exists, it will serve as a justification for any conduct which is reasonably necessary to effect the arrest. Restatement (Second) of Torts § 118 comment b (1977).

Whether the arrest here conducted was privileged is determined pursuant to the requirements established in the Puerto Rico Rules of Criminal Procedure (34 L.P.R.A. App. II). Insofar as the arrest of plaintiffs took place by peace officers without a warrant, the applicable provision is Rule 11. It states that:

A peace officer may arrest a defendant without the corresponding warrant:

(a) When he has reasonable grounds to believe that the person about to be arrested has committed the offense in his presence. In this case the arrest shall be made immediately or within a reasonable time after the commission of the offense. Otherwise, the official shall request that a warrant of arrest be issued.

(b) When the defendant has committed a felony, although not in the officer's presence.

(c) When he has reasonable cause for believing that the person about to be arrested has committed a felony, regardless of whether or not the said offense was in fact committed.

Upon consideration of the facts of this case, we are convinced that subsection (c) is clearly applicable, and, as such, plaintiffs arrests were privileged. There can be no doubt, in light of the evidence submitted at trial, that the federal officials who arrested plaintiffs in San Juan possessed enough information and knowledge to lead an ordinary and prudent person to believe that the individuals arrested had committed an offense. *People v. Cabrera Cepeda*, 92 P.R.R. 68 (1965). Accordingly, the subsequent searches and handcuffing of plaintiffs did not amount to the commission of the tort of assault and battery as they claimed. There was no proof whatsoever that the handcuffing of plaintiffs constituted an unreasonable use of force, perhaps because it is now performed as a standard precautionary measure after almost every arrest. Moreover, the searches were limited to a pat-down, and as such were not so patently intrusive as to exceed the privileged conduct. (*See also People v. Gonzalez–Rivera*, 100 P.R.R. 650 (1972); *People v. Del Río*, 113 D.P.R. 684, 691 (1982), holding that under Puerto Rico law a reasonable search incidental to a lawful arrest is valid). In view of this, we DISMISS claim numbered 11 for failure to state a claim.

In their next claim, numbered 12, plaintiffs allege that they were falsely arrested by Drug Enforcement Agents and Customs Agents when they were deboarding the DALLAS after arriving to San Juan (*see* complaint, ¶ 167, p. 29). In claim numbered 13, plaintiffs similarly assert that they were falsely arrested and/or imprisoned when they were ordered incarcerated at the State Penitentiary in Río Piedras and at the Vega Alta Women's Prison (*Id.*, at ¶ 170, p. 29). On the other hand, claim numbered 14 states that all plaintiffs were the victims of a malicious prosecution as a result of the "baseless charges brought against them by defendant." (*Id.*, at ¶ 171, p. 30.)

■ Under Puerto Rico law, the causes of action for false arrest and false imprisonment share identical elements. *Casanova v. González–Padín*, 47 P.R.R. 462, 470 (1934). The Supreme Court has stated that a cause of action under these legal theories accrues every time that "(a) person, whether or not a law enforcement officer, may by himself or through another one unlawfully detain or cause the unlawful detention of another person." *Ayala v. San Juan Racing Corp.*, 112 D.P.R. 804, 813 (1982). The Court has suggested, however, that in actions for false arrest and imprisonment brought against law enforcement officers the determination of what constitutes an unlawful detention shall be made according to the requirements established in Rule 11 of the Puerto Rico Rules of Criminal procedure, previously examined. *Id.*, at 814–15.

■ With regard to actions alleging a malicious prosecution, the Court has repeatedly held that four essential elements must be alleged and proven in order for it to prosper. These are: 1) that a criminal action was initiated and instigated by defendants, 2) that the criminal action terminated in favor of plaintiffs, 3) that defendants acted with malice and without probable cause, and 4) that plaintiffs suffered damages. *Ocasio–Carrasauillo v. Rosa Berríos*, 88 J.T.S. 42 (1988), *Raldiris v. Levitt & Sons of P.R., Inc.*, 103 D.P.R. 778, 781 (1975), *Escoda v. Hull Dobbs Co. of P.R.*, 100 P.R.R. 304, *Parés v. Ruiz*, 19 P.R.R. 323, 327 (1913). *See also Torres v.*

*Superintendent of Police of Puerto Rico*, 893 F.2d 404, 409 n. 7 (1st Cir.1990). The term "probable cause" has been defined in the context of this action as a " 'suspicion founded upon circumstances sufficiently strong to warrant a reasonable man in the belief that the charge is true.' (S)aid question does not depend upon whether or not the offense was committed, 'but on the belief of the accuser in the truth of the charge made by him.' " *Raldiris v. Levitt, supra*, (quoting *Parés v. Ruiz, supra*, at p. 331).

■ In view of the above-stated principles of law, it is evident that in order for plaintiffs to prove that the torts of false arrest/imprisonment and malicious prosecution were committed they were required to demonstrate that the arresting officers lacked "reasonable cause for believing that (they had) committed a felony ...," Rule 11(c) of the Puerto Rico Rules of Criminal Procedure; or that they acted with malice and without probable cause, respectively. However, the evidence presented at trial supports just the opposite conclusion, as it overwhelmingly shows that when the D.E.A. and Customs officers arrested plaintiffs they had sufficient reasonable and/or probable cause to believe that they were in fact involved in a drug smuggling venture with the crew members of the STECARIKA. Accordingly, we conclude that there can be no liability for false arrest/imprisonment as a matter of law. Moreover, inasmuch as the criminal charges brought against plaintiffs were based on that same inculpating information, an action for malicious prosecution will not lie. Therefore, we also DISMISS plaintiffs' claims numbered 12, 13 and 14 for failure to state a claim.

■ In their claim numbered 15, plaintiffs alleged that they sustained numerous batteries while incarcerated at the Río Piedras State Penitentiary and the Vega Alta Women's Prison. The incidents which allegedly constituted these tortious acts, as proven at trial, were the following: 1) an initial search to which the male plaintiffs were subjected upon arriving to the prison, 2) two strip searches to which the female

plaintiffs were subjected, one immediately after arriving to the prison, and another upon returning to it after a day-long visit to the U.S. Marshall's Office and 3) repeated frisks conducted on the women plaintiffs every time they returned to their cells from the prison's recreation area. The evidence failed to demonstrate that in any of these occasions the persons in charge of conducting the searches exceeded their authority, or in any way harmed the plaintiffs. We do recognize that plaintiffs had reason enough to feel offended by the requirement to submit to this procedure, more so when they were convinced of their innocence. But, at the same time, we acknowledge the need of prison officials to adopt reasonable preventive measures in order to guarantee the general security of the prisons, and specifically of the prisoners under their custody and the personnel that labors there. Searches such as the ones here at issue are clearly permissible in order to foster these policies. Furthermore, as it has been held that the incidental and necessary touching by correctional officers of inmates in the performance of their duties are not batteries, but privileged contacts. *Picariello v. Fenton*, 491 F.Supp. 1026, 1038 (D.C.Pa.1980), we conclude that no batteries were committed against plaintiffs when they where searched while at prison. Claim numbered 15 is hereby DISMISSED.

In their next three claims, numbered 16, 17 and 18, plaintiffs allege that they were the victims of the tort of abuse of process. In claim 16, they specifically aver that the D.E.A. and Customs agents illegally interrogated and detained them for several hours, allegedly in an attempt to obtain information that could be used to justify what they considered an illegal arrest effectuated by the Coast Guard (*see* complaint, ¶ 177, p. 31). Claim numbered 17, on the other hand, states that the D.E.A. and Customs agents repeatedly denied them the use of a telephone to call the Australian embassy and their families, which they aver would have expedited their release from prison (*see* complaint, ¶ 180, p. 32). Furthermore, in claim numbered 18, plaintiffs affirm that they were ordered

incarcerated on the basis of unsupported allegations, presumably "to afford Customs and D.E.A. agents the opportunity to obtain information that they hoped would justify plaintiffs continued detention and prosecution" (*see* complaint, ¶ 183, p. 33).

Although the tort of abuse of process has been recognized in Puerto Rico, the Supreme Court has failed to identify its essential elements. *Acosta & Rodas v. PRAICO*, 112 D.P.R. 583, 605 (1982). It is generally accepted, however, that the necessary constituent of the tort of abuse of process is the use of legal process, civil or criminal, primarily to accomplish a purpose for which it is not designed. Restatement Second of Torts § 682 (1977); *Landrigan v. City of Warwick*, 628 F.2d 736, 745 n. 6 (1st Cir.1980). In order to prevail on such a claim, it must be demonstrated that defendant was motivated by an ulterior purpose in bringing legal proceedings against plaintiffs and that the proceedings resulted in a perversion of a judicial process and the achievement of some end not contemplated in the regular prosecution of the charge. *McCarthy v. Kleindienst*, 741 F.2d 1406, 1414 (D.C.Cir.1984), *Gowin v. Altmiller*, 663 F.2d 820, 824 (9th Cir.1981). It should be noted that the essence of the tort of abuse of process lies in the misuse of *judicial* proceedings. *McCarthy, supra.*

At the outset, we notice that as claim numbered 16 deals with incidents that took place before any judicial proceedings were commenced against plaintiffs, this in itself seems to defeat the cause of action for abuse of process for failure to comply with one of its essential elements as just described. Moreover, we find another reason just as compelling to dismiss not only claim 16, but also the two other related claims, as we conclude that plaintiffs failed to prove at trial that defendants were motivated by some improper purpose when initiating the legal proceedings against them. The evidence showed, quite to the contrary, that the actions taken by the agents in interrogating plaintiffs were solely in furtherance of their duty to investigate the apparent criminal activities in which they appeared to be involved, as

suggested by the circumstances, when intercepted by the Coast Guard while on the high seas. Similarly, in filing the criminal charges against plaintiffs it appears that the agents' only intention was to obtain their conviction for the purported illegal conduct in which they were involved, and not to use the criminal procedure for any other purpose for which it was not designed and intended. Finally, we observe that plaintiffs were denied the use of the phone only when they attempted to make a long-distance call, after they had been permitted to use the same for local calls. Even if we were to acknowledge that this may well constitute negligent conduct on the part on the acting agent, particularly when he was specifically ordered by the magistrate to allow the plaintiffs to contact their embassies, it nonetheless fails to meet the elements required to be actionable under the theory of abuse of process.[4] No ulterior motive was shown as the motivating factor for that conduct either. Given the circumstances, plaintiffs' claims numbered 16, 17 and 18 are also DISMISSED.

 We now consider plaintiffs' claim numbered 26 on the merits, having previously rejected the government's request for its dismissal based on the discretionary function exception. As stated before, in this claim plaintiffs allege that the officers of the Department of State acted negligently in determining that the ESPERANCE was a stateless vessel, a decision that originated nearly all the subsequent tortious conduct and accompanying damages now alleged in the complaint. Having carefully considered plaintiffs' assertion, however, we must reject it. We are convinced that the Department of State official did not act negligently in concluding that the ESPERANCE was a stateless vessel under the applicable standards.

As established at trial, the determination of statelessness made by the Department of State officials was based on the representation made to them by Coast Guard officers that plaintiffs had made a verbal claim of Australian registry when first approached by the DALLAS, which was later refuted by the Australian government pursuant to the established procedures. It is undisputed that a claim of registry later refuted by the putative country of registry is one of the accepted conditions to declare the vessel as stateless (see finding of fact numbered 17). Nonetheless, plaintiffs repeatedly alleged at trial that, as they had properly claimed, that the ESPERANCE was registered at the Hutt River Province and not Australia, the Department of State officials acted negligently when they failed to consider this claim of registry and did not make any attempt to confirm it with the Hutt River Province's government. The evidence showed conclusively, however, that during most of the time in which these incidents took place the ESPERANCE was flying the Australian flag as its flag of registry, which constituted a valid claim of registry under that nation. Due to these circumstances, the fact remains that even if the Department of State officials would have been notified of plaintiffs' oral claim of registration under the Hutt River Province, their determination of Statelessness with regard to the ESPERANCE would not have been altered, as it clearly met another of the accepted conditions under which to declare a vessel stateless: claiming registry under more than one country. Therefore, the officials of the Department of State did not commit any negligent act when they declared the ESPERANCE a stateless vessel. Accordingly, plaintiffs' claim numbered 26 is hereby DISMISSED.

Finally, we entertain plaintiffs' claim numbered 30, which basically consists of a repetition of allegations previously raised under claims numbered 12, 13, 14 and 26 (see complaint, ¶ 214, pp. 38–39). Since what has been said upon ruling on those claims is similarly applicable here, we also DISMISS this claim for failure to state a claim.

---

**4.** The tort of abuse of process is, after all, an intentional tort. *See* Prosser and Keeton, *The law of torts* § 121 (1984).

*CONCLUSION*

■ For the reasons stated, plaintiffs are impeded in obtaining relief from this Court for the unfortunate incidents they experienced on the dreadful week of June 18–29, 1984. Although this may seem unfair, it is not irrational, for as Judge Dorsey has explained:

> Fair play concepts suggests that one adversely impacted by actions of others which he did not actively cause and could not have prevented should not go uncompensated. Yet, imposition of liability for compensation is not merely a matter of fair play, it requires that a claim conform to established legal principles. In any society, interrelation of people precipitates friction and detriment, not all of which is compensable. Where one such as plaintiff has suffered detriment and is unable to assert a claim which conforms with established legal principles for liability, he is the innocent victim of the effects of necessary and lawful conduct. That is a price of living in a society. It is unfortunate, but a necessary price if society is to live by established law as opposed to a general concept that every detriment entitles one to compensation.

This Court sympathizes with the embarrassment, humiliation and frustration that plaintiffs surely suffered as a result of the incidents for which they sought relief in this action. We are barred, however, by multiple legal theories to grant relief. Having carefully considered the facts and the applicable law, we ORDER that this action be DISMISSED.

SO ORDERED.